**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

Mauricio Jasso, et al.,

Plaintiffs,

v.

Wells Fargo Bank, N.A., et al.,

Defendants.

Case No. 2:20-cv-00858-RFB-BNW

**Order re [50], [51], and [52]**

Before the Court are three motions by plaintiffs to compel discovery. ECF Nos. 50-52. Defendants opposed each motion, plaintiffs replied, and the Court held oral argument. ECF No. 75. For the reasons explained below, the first two motions are granted in part and denied in part, and the third motion is denied as moot. Further, the Court finds sufficient basis to order that defendant Wells Fargo Bank make an in-camera submission of those documents that it has withheld on the basis of the Suspicious Activity Report privilege.

I.      **Background**[1]

Plaintiffs allege that nonparty Daniel Maza-Noriega conducted a ponzi scheme with assistance and participation by defendant Wells Fargo. Maza and plaintiffs essentially grew up together as friends and family in Mexico. Later in life, Maza and plaintiff Jasso established JAMA as 50-50 co-owners. JAMA was used as a vehicle for plaintiffs to invest funds into Maza's own entity, First Prime Mortgage (or "FPM" for short).

Plaintiffs were led to believe that their funds were being invested by Maza and FPM into foreclosed American real estate. The supposed plan was that FPM would renovate the real estate and sell it at a premium to a Chinese investment company. According to the JAMA investment

---

[1] The information in this section was drawn from the allegations in plaintiffs' complaint and the underlying briefing. The Court makes no conclusive findings of fact.

agreements, investors would receive a 30% or higher return.  However, plaintiffs allege that once funds reached the FPM Wells Fargo accounts, Maza would simply funnel his investors' millions into one of his other multitude of Wells Fargo checking accounts; soon after, Maza would use the money to pay off his wife's American Express Black Card or he would wire the money offshore to Russia, Hong Kong, Mexico, Canada, or somewhere in Europe.

According to plaintiffs, Maza initially tried opening the JAMA account at Citibank, Bank of America, and JPMorgan Chase.  However, each of these banks closed Maza's accounts after only 1 month, allegedly because of fraudulent activity.  Maza eventually turned to Wells Fargo, where he maintained the FPM accounts for some time.  Wells Fargo employee/individual defendant Katherine Darrall supposedly insisted that Citibank was at fault for the closure of Maza's accounts, and she explained to Jasso that Maza was an "excellent performer" and "one of our best clients."  Individual defendant Jose Rico was also a Wells Fargo banker during the events alleged in the complaint, and he supposedly joined Darrall in making statements about the success of FPM and Maza.  Jasso conveyed these supposed assurances to the other plaintiffs.  Based on these assurances, the plaintiffs invested additional millions into Wells Fargo's accounts.

Eventually, after plaintiffs invested $25 million (and reinvested $15 million) into FPM, Jasso demanded to see the FPM account balances.  Jasso revealed that the accounts contained a negative balance of $1,000.  The underlying lawsuit followed, and plaintiffs assert claims for negligence, aiding and abetting breach of fiduciary duty, fraudulent misrepresentation, fraudulent inducement, fraudulent concealment, and civil conspiracy.

**II.    Legal standards**

### a.  Discovery and motions to compel

Discovery is broad. *Jackson v. Montgomery Ward & Co.*, 173 F.R.D. 524, 528 (D. Nev. 1997).  Parties may obtain discovery on any nonprivileged matter (a) relevant to any party's claim or defense and (b) proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1).

Relevance under Rule 26(b)(1) is broad, too. *See, e.g.*, *Burke v. Basil*, 2021 WL 3265022, at *1 (C.D. Cal. May 28, 2021).  The Federal Rules of Civil Procedure were amended in 2015 to clarify that the scope of permissible discovery "is no longer information that is 'reasonably

1   calculated to lead to the discovery of admissible evidence.'" *Mfg. Automation Software Sys., Inc.*

2   *v. Hughes*, 2017 WL 5641120, at *3 (C.D. Cal. Sept. 21, 2017).  Instead, "[t]he test going forward

3   is whether" the sought discovery "is relevant to any party's claim or defense." *In re Bard IVC*

4   *Filters Prods. Liability Lit.*, 317 F.R.D. 562, 564 (D. Ariz. 2016).  The trial court has "broad

5   discretion in determining relevancy for discovery purposes." *Surfvivor Media, Inc. v. Survivor*

6   *Prods.*, 406 F.3d 625, 635 (9th Cir. 2005).

7        To determine whether discovery is proportional, the Court considers "the importance of

8   the issues at stake in the action, the amount in controversy, the parties' relative access to relevant

9   information, the parties' resources, the importance of the discovery in resolving the issues, and

10   whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R.

11   Civ. P. 26(b)(1).  Information need not be admissible in evidence to be discoverable. *Id.*

12        When a party fails to provide requested discovery, the requesting party may move for an order

13   compelling discovery. Fed. R. Civ. P. 37(a)(1).  When the discovery sought appears relevant on its

14   face, the party resisting discovery bears the burden of establishing the lack of relevance. *Krause v.*

15   *Nevada Mutual Insurance Company*, 2014 WL 496936, at *3 (D. Nev. Feb. 6, 2014).  Conversely, if

16   the relevance of the discovery sought is ***not*** apparent, then the party seeking discovery bears the

17   burden of establishing the relevance of the request. *Id.*  Once the relevance hurdle is cleared, the party

18   seeking to avoid discovery bears the burden of explaining why discovery should be denied.  *U.S.*

19   *EEOC v. Caesars Entertainment*, 237 F.R.D. 428, 432 (D. Nev. 2006).  The court has broad

20   discretion to permit or deny discovery, and its decision will not be disturbed "except upon the

21   clearest showing" that the denial "results in actual and substantial prejudice to the complaining

22   litigant." *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002).

23              **b.  The Bank Secrecy Act and Suspicious Activity Reports**

24        Under the Bank Secrecy Act ("BSA"), the Secretary of the Treasury "may require any

25   financial institution . . . to report any suspicious transaction relevant to a possible violation of law

26   or regulation." 31 U.S.C. § 5318(g)(1).

27        The Financial Crimes Enforcement Network ("FinCEN") and Office of the Comptroller of

28   the Currency ("OCC") have each issued relevant regulations.  FinCEN requires a SAR when a

1   transaction involves at least $5,000 and "the bank knows, suspects, or has reason to suspect that . .

2   . [t]he transaction involves funds derived from illegal activities or is intended or conducted in

3   order to hide or disguise funds or assets derived from illegal activities." 31 C.F.R. §

4   1020.320(a)(2)(i).  Similarly, the OCC requires a bank to file a SAR when it "detect[s] a known

5   or suspected violation of Federal law or a suspicious transaction related to a money laundering

6   activity or a violation of the [BSA]." 12 C.F.R. § 21.11(a).  Banks file their SARs with FinCEN.

7   31 C.F.R. § 1020.320(b)(2); 12 C.F.R. § 21.11(c).

8          If a bank makes a SAR, then it and its employees are prohibited from "notify[ing] any

9   person involved in the transaction that the transaction has been reported." 31 U.S.C. §

10   5318(g)(2)(A)(i).  The implementing regulations by the FinCEN and OCC each similarly prohibit

11   a bank from disclosing a SAR, but also any information that "would" reveal the existence of a

12   SAR. 31 C.F.R. § 1020.320(e)(1)(i);12 C.F.R. § 21.11(k)(1)(i).  Both the FinCEN and OCC have

13   issued interpretive guidance stating that the disclosure prohibitions extend to no-SAR decisions as

14   well. 75 Fed. Reg. 75593, 75595 (Dec. 3, 2010) ("an institution also should afford confidentiality

15   to any document stating that a SAR has *not* been filed.") (emphasis added); 75 Fed. Reg. 75576,

16   75579 (Dec. 3, 2010) ("By extension, a national bank also must afford confidentiality to any

17   document stating that a SAR has not been filed.").  The logic driving both of these interpretations

18   is that if a bank were able to disclose "information when a SAR is not filed, institutions would

19   implicitly reveal the existence of a SAR any time they were unable to produce records because a

20   SAR was filed." 75 Fed. Reg. 75593, 75595 (Dec. 3, 2010); *accord* 75 Reg. 75576, 75579.

21          Stated plainly, then, "the key query is whether any . . . documents suggest, directly or

22   indirectly, that a SAR was or was not filed." *In re JPMorgan Chase Bank, N.A.*, 799 F.3d 36, 43

23   (1st Cir. 2015).  When the OCC promulgated its final regulations, it emphasized that "the strong

24   public policy that underlies the SAR system as a whole . . . leans heavily in favor of applying

25   SAR confidentiality not only to a SAR itself, but also in appropriate circumstances to material

26   prepared by the national bank as part of its process to detect and report suspicious activity,

27   regardless of whether a SAR ultimately was filed or not." 75 Fed. Reg. 75576-01, 75579 (Dec. 3,

28   2010).  To that end, some courts have held that "documents which have been prepared as part of a

1   national bank's process for complying with federal reporting requirements are covered by the

2   SAR privilege." *Lan Li v. Walsh*, 2020 WL 5887443, at *2 (S.D. Fla. Oct. 5, 2020).

3          There are limitations to the scope of the SAR.  The regulations provide that the disclosure

4   prohibition does *not* extend to "[t]he underlying facts, transactions, and documents upon which a

5   SAR is based." *See, e.g.*, 31 C.F.R. § 1020.320(e)(1)(ii)(A)(2); *accord Cotton v. Private Bank and*

6   *Trust Co.*, 235 F. Supp. 2d 809, 815 (N.D. Ill. 2002) ("documents which give rise to suspicious

7   conduct . . . are to be produced in the ordinary course of discovery because they are business

8   records made in the ordinary course of business").  Plus, the use of the term "would" in the

9   regulations has been construed to mean that "review of the document must" reveal "with effective

10  certainty the existence of a SAR." *First Am. Title Ins. Co. v. Westbury Bank*, 2014 WL 4267450,

11  at *2 (E.D. Wis. Aug. 29, 2014).  "[I]nformation that, with aid of supposition or speculation,

12  might tend to suggest to a knowledgeable reviewer whether a SAR was filed, is not privileged."

13  *Id.*

14         To the extent the SAR privilege applies, it "is unqualified and cannot be waived." *Id.*

15  **III.     ECF No. 50**

16  **RFP No. 40**

17         RFP No. 40 requests "any Bank Secrecy Act or fraud alerts that were generated by Wells

18  Fargo's automated account monitoring systems to identify suspicious activity for any of the Maza,

19  JAMA and FPM accounts; any investigations performed as a result of the alerts; any documentation

20  evidencing investigations by the Bank Secrecy Act or fraud analysts into the alerts; and any actions

21  taken as a result of the investigations performed regarding the alerts." ECF No. 50 at 9.

22         According to Wells Fargo, it identified a few alerts on incoming funds, but nothing else.

23  Wells Fargo therefore raises a relevance objection. ECF No. 54 at 12.  The Court in its discretion

24  overrules the objection and finds that the limited alerts on incoming funds are relevant on their face to

25  plaintiffs' claims because they might show that Wells Fargo knew or should have known that

26  incoming funds were fraudulent or suspicious.  Wells Fargo represents that it reviewed the alerts and

27  determined the funds were valid.  However, the Court in its discretion finds that this information is

28  relevant and plaintiffs are entitled to it under the broad scope of discovery.

1    Turning to proportionality, the Court notes that at issue are only a "limited" amount of alerts,

2  *id.*, so it should not be unduly burdensome to acquire the targeted discovery.  Further, there is a large

3  amount of money at stake in this case, and the alerts appear highly relevant.  Therefore, the Court in

4  its discretion finds that the requested discovery is proportional.

5    Wells Fargo also raises an objection under the BSA.  However, it is not entirely clear to the

6  Court how these alerts "would" reveal with effective certainty, either directly or indirectly, that Wells

7  Fargo did or did not file a SAR.

8    Therefore, Wells Fargo is ordered to supplement its response to RFP No. 40.  To the extent

9  Wells Fargo believes the BSA privilege applies, it must produce a log to defendants and submit the

10  documents to the Court for in-camera inspection.

11  **RFP No. 56**

12    This request asks for "all policies and procedures relating to automated account monitoring

13  systems designed to identify suspicious activity utilized by Wells Fargo, including the User Guides

14  for each system, and investigative protocols required for the Bank Secrecy Act analysts." ECF No. 50

15  at 9.

16    The Court finds that the policies and procedures relating to automated account monitoring

17  systems are relevant on their face to the extent they reveal when or in what contexts the alerts were or

18  ***should have*** been generated ***for conduct alleged in the complaint***.  To the extent the requested

19  documents do not reveal that kind of information, then they are ***not*** relevant and need not be

20  produced.

21    However, the Court finds that the "user guides" sought are irrelevant.  As Wells Fargo states,

22  a user guide merely explains which buttons to click in certain situations.  User guides will not reveal

23  the "how, why, and when" Wells Fargo's systems generated (or did not generate) alerts. ECF No. 54

24  at 15.

25    Further, plaintiffs' request for "investigative protocols" prompted by the alerts are relevant

26  only with respect to the actual alerts generated.  In other words, plaintiffs have not ***yet*** established the

27  relevance of investigative protocols prompted by alerts that were ***not*** generated by Wells Fargo's

28  automatic systems; to the extent those alerts are relevant, plaintiffs have not yet established their

proportionality to the needs of the case because they are not important to resolving the issues in this case and their likely benefit is outweighed by the burden of searching through the thousands of policies and procedures possessed by Wells Fargo.  Further, the Court clarifies that "investigative protocols" are a subcategory of the ultimate request for "policies and procedures relating to automated account monitoring systems."  Therefore, if the policies and procedures do not reveal the "how, why, and when"—as stated earlier—then Wells Fargo need not produce the investigate protocols either.

The Court overrules Wells Fargo's proprietary and confidentiality objections.  These concerns are appropriately ameliorated by the protective order in place.

The Court overrules Wells Fargo's overbreadth and overburdensome objections because the Court finds that the request, as narrowed, is relevant and proportional to the needs of the case.

**ROG No. 2**

Through ROG No. 2, plaintiffs seek " the names of all fraud detection systems and all automated account monitoring systems (such as Search Space), that were utilized to identify suspicious and/or fraudulent activity, and any alerts identified in connection with Maza, a Maza-related entity, JAMA or FPM or any of their accounts." ECF No. 50 at 10.  The request goes on to describe 6 subcategories, which the Court will address as needed.

The Court finds that the requested information is relevant to the extent there exist systems designed to generate alerts for the conduct alleged in the complaint.  The names of systems designed to identify fraud dissimilar to that alleged in the complaint—including, for example, fraud in check deposits—are irrelevant.

The Court overrules Wells Fargo's proprietary and confidentiality objections.  These concerns are appropriately ameliorated by the protective order in place.

The Court overrules Wells Fargo's overbreadth and overburdensome objections because the Court finds that the request, as narrowed, is relevant and proportional to the needs of the case.

Wells Fargo asserts the BSA nondisclosure privilege.  The Court strains to see how the names of fraud-detection alert systems would reveal with effective certainty whether Wells Fargo filed a SAR.  To the extent responsive documents exist that Wells Fargo believes are covered by the privilege, Wells Fargo must produce a privilege log and make an in-camera submission to the Court.

Notably, subcategory "F" asks Wells Fargo to disclose whether it filed a SAR, and this is clearly prohibited by the BSA.

**RFP Nos. 49–52**

These requests call for the production of all documents related to compliance audits, internal audits, remedial efforts, and internal Wells Fargo investigations over a 6-year period regarding several broad categories. ECF No. 50 at 15-18.

Wells Fargo argues that the requests as propounded are not proportional because they are not limited to documents or topics that are account-specific.  The Court agrees. The requests capture the universe of Wells Fargo's bank-wide compliance audits over a 6-year period.  Plaintiffs have failed to establish the relevance of such a broad request.  To the extent this request may capture some information relevant to the claims and defenses in this case, plaintiffs are not permitted to lodge such broad requests in hopes of later perusing the documents to find something relevant. *Briggs v. Cnty. of Maricopa*, 2021 WL 1192819, at *5 (D. Ariz. Mar. 30, 2021) (explaining that a propounding party "may not simply ask for everything falling into" a particular category "and then peruse the documents at its leisure in hopes of finding something relevant.").  Further, the request is not proportional to the needs of the case because—given the breadth of the requests—the Court finds that the burden or expense of the proposed discovery outweighs its likely benefit.

Furthermore, Wells Fargo asserts that the documents sought do not, in fact, contain account- or branch-specific information. ECF No. 54 at 16; Tr. of Aug. 3, 2021 hearing at 10:30:20.  Plaintiffs in their reply seemingly recognize the striking breadth of their requests and agreed to narrow them to documents relating to compliance audits, internal audits, remedial efforts, and internal Wells Fargo investigations that "concern or mention any of Maza's Wells Fargo accounts, any Las Vegas branch account, or the branch itself, or if the audits, reports, investigative findings and remedial measures were ever provided to branch managers, relationship managers, the CEO Portal employees, or any employees that had any involvement with Maza's accounts, they must be produced because they constitute red flags that go to knowledge." ECF No. 66 at 11.

The Court in its discretion will further narrow the requests to include only those audits, remedial efforts, and internal investigations that concern or mention any of Maza's Wells Fargo

1  accounts.  The Court finds that the branch-wide requests are still too broad to be proportional to the

2  needs of this case, particularly given Wells Fargo's representation that even if Wells Fargo were aware

3  of a certain systemic failure, it could not possibly know which accountholder's activity should have

4  been detected.

5        Additionally, the Court will narrow the broad categories sought by the requests.  Plaintiffs

6  have failed to show the relevance of the following categories: fiduciary accountholders, the USA

7  Patriot Act, the opening of accounts, and cross-selling policies.

8        As narrowed in this order, the requests are relevant and proportional to the needs of the case.

9  If Wells Fargo believes that any of these document would reveal with effective certainty whether a

10  SAR or no-SAR decision was made, then it must produce a privilege log and make an in-camera

11  submission to the Court.  If Wells Fargo intends to rely on some other privilege already invoked in its

12  discovery responses, then it need only produce a privilege log to plaintiffs and it must not make an in-

13  camera submission.

14        Finally, the court overrules Wells Fargo's vagueness objections in RFP Nos. 49 to 52.

15  Regarding the term "remedial efforts" specifically in RFP No. 51: the Court construes it to mean

16  actions taken in response to the identification of suspicious or fraudulent activity.  The Court also

17  orders the parties to meet and confer regarding the scope of the terms "compliance audits," "internal

18  audits," and "internal investigations."

19  **RFP No. 17**

20        Plaintiffs seek " all documents relating to placing holds on FPM's wires, as alleged in

21  paragraph 61 of the Complaint." ECF No. 50 at 20.

22        Wells Fargo has waived its relevance objection.  In any event, the information sought appears

23  highly relevant because plaintiffs squarely allege that Maza effected (and defendants abetted) the

24  ponzi scheme through large international wire transfers.

25        Wells Fargo states that the requested discovery is not proportional to the needs of the case

26  because it would require Wells Fargo to search for and produce wire hold documents over a six-year

27  period wherein Maza initiated hundreds if not thousands of wire transfers.  In plaintiffs' reply and at

28  oral argument, plaintiffs limited their discovery request to "emails relating to wire holds," which is

1    significantly narrower than the text of the request as propounded.  Further, given that the information

2    is relevant, it is defendants' burden to show why discovery should be denied, and defendants have

3    failed to do that.

4          Defendants have not shown that the requested discovery violates the proportionality rule.  The

5    term "hundreds if not thousands" could mean 200 wire transfers or 5,000. Further, Wells Fargo has

6    easier access to this information relative to plaintiffs because the accounts were not plaintiffs'

7    accounts and the holds were effected by Wells Fargo itself.   Furthermore, the Court has no indication

8    how much time it would take to conduct this search.  Therefore, the Court in its discretion finds that

9    this information is relevant and proportional.  Defendants must supplement their response.

10       **IV.     ECF No. 51**

11   **RFP No. 40 and ROG No. 15**

12          These requests call for the production of documents or information regarding policies and

13   procedures concerning the retention of bank records, data retention, data backup, data archiving,

14   disaster recovery, data deletion, or destruction of documents. ECF No. 51 at 5-6.

15          The Court's analysis of these requests is guided by *Montgomery v. Wal-Mart Stores, Inc.*,

16   2015 WL 11233390 (S.D. Cal. Sept. 4, 2015).  There, the court recognized that a request for

17   document retention policies is relevant when the responding party claims it cannot locate certain

18   documents because they do not exist. *Id.* at *3.  Like the plaintiff in *Montgomery*, the plaintiffs here

19   do not seek these documents to show that compliance or noncompliance caused their injuries, but to

20   assist in their investigation into the existence of potentially relevant information.  "Although the

21   policies may ultimately not be admissible, the standard for discovery is more broad than the standard

22   for admissibility." *Id.*

23          With this in mind, the Court finds that plaintiffs have only established the relevance of

24   documents or information regarding policies and procedure concerning the retention of documents

25   that defendants claim no longer exist.  This includes policies and procedures that defendant Darrall

26   was subject to (regarding her emails, for example) during the events described in the complaint.  The

27   Court declines to order a broader production because, as explained below, the Court finds that

28   documents pertaining to Maza's personal mortgage application are irrelevant.  Further, plaintiffs have

failed to establish the relevancy of the requests with respect to systems data, telephone call records, and voicemail messages or records.  However, the Court makes clear that its ruling today applies to both short- and long-term storage of emails.

Accordingly, Wells Fargo is ordered to supplement its response to RFP No. 40 and ROG No. 15 consistent with this order.

### Requests relating to work history and performance

**RFP No. 58, ROG No. 7, RFP No. 15 to Rico, ROG No. 3 to Rico, RFP No. 16 to Darrall, and ROG 3 to Darrall**.

Plaintiffs seek documents or information "relating to any adverse employment action, reprimand, demotion, or any other disciplinary action taken by Wells Fargo against" certain employees. ECF No. 51 at 7-14. The Court in its discretion finds that the sought documents or information are relevant only with respect to disciplinary actions or reprimands taken against the employees for conduct, the nature of which is at issue in the complaint.  This conduct includes failing to notice or report potentially fraudulent activity.  Plaintiffs have otherwise failed to establish relevance, in part because they do not assert claims based on negligent hiring or negligent supervision.

Defendants represent that they have no documents or information responsive to these requests, as narrowed by the Court.  Therefore, there is nothing to compel and no further response is required.

**RFP No. 59**

Plaintiffs seek documents or information "relating to any promotion, commendation, award, or other favorable employment action taken by Wells Fargo" as to Rico, Darrall, or Monzon. *Id.* at 8. The Court agrees with Wells Fargo that these requests are relevant only to the extent these employees received favorable employment actions for opening accounts or doing business for any particular entity or persons, and only during the events described in the complaint.  Plaintiffs have otherwise failed to establish the relevance of this request to any claim or defense in this case.  As narrowed, Wells Fargo states that it has no responsive documents.  Therefore, no further response is required.

…

…

**RFP No. 60**

In this request, plaintiffs similarly seek documents relating to any salary, salary increase, bonus, or commission given by Wells Fargo to Rico, Darrall, or Monzon. *Id.* at 9.  The Court agrees with Wells Fargo that these documents are relevant only to the extent that a salary increase, bonus, or commission was given for opening accounts or doing business for any particular entity or person. The Court finds that plaintiffs have otherwise failed to establish the relevance of these documents.  As narrowed, Wells Fargo states that it has no responsive documents.  Therefore, no further response is required.

**RFP No. 62**

The relevant information and documents sought by this request is encompassed by RFP Nos. 59 and 60.  Therefore, no further response is required.

**Rico's licensure**

**RFP No. 19; RFP No. 14 to Rico; ROG No. 8 to Rico**

These requests call for the production of documents and information relating to Rico's status as a licensed broker and his registration with Wells Fargo Clearing Services, LLC, as alleged in Paragraph 87 of the Complaint. ECF No. 51 at 17-18.

The Court finds that plaintiffs have failed to establish the relevance of these requests.  The licensure is not relevant on its face, so it is plaintiffs' burden to establish relevance.  However, plaintiffs state very plainly that they do not "know whether Rico's status as a licensed broker played any role in the substantial assistance Plaintiffs allege he provided to Maza in misleading JAMA investors." ECF No. 64 at 6.  Plaintiffs have not carried their relevance burden, so the Court will not compel further response.

Plaintiffs resist this conclusion by asserting that they must establish that Rico "knowingly and substantially assisted the primary violator in committing the breach." ECF No. 64 at 6. However, the Court finds that plaintiffs have ***not*** sufficiently explained how licensure documents would aid in that endeavor, particularly given that none of the conduct alleged with respect to Rico required a license and Rico never sold securities to plaintiffs. Further, none of the conduct at issue in the complaint involved Wells Fargo Clearing Services.

Page 12 of 15

1

**Maza's Mortgage**

2
**RFP No. 27**

3    This request calls for the production of "all documents relating to Maza's personal

4 mortgage and your decision to decline his mortgage application." ECF No. 51 at 19.

5    The Court finds that this request is not relevant.  Plaintiffs have failed to establish a

6 relationship between Maza's creditworthiness for a mortgage application and any supposed

7 fraudulent or negligent misrepresentations by defendants.  For example, the Court strains to see

8 how Maza's creditworthiness for a mortgage relates to whether Maza was an "excellent

9 performer" or one of Wells Fargo's "best clients" with respect to his FPM accounts.  As Wells

10 Fargo states, qualifying for a mortgage loan for hundreds of thousands of dollars takes into

11 consideration different factors than having a checking account where a customer maintains its

12 own money.  To the extent this information is relevant, it is not proportional, primarily because

13 the mortgage application does not seem important to the issues in this case. No further response to

14 this request is required.

15

**Transfer policies**

16    The motion focuses heavily on policies specific to the CEO Portal.  However, based on

17 the briefing and oral argument on this matter, the parties are seemingly in agreement now that

18 **RFP No. 43** must be limited to its original text: "all policies and procedure regarding wire

19 transfers, internal transfers, and ACH." ECF No. 51 at 20.

20    Unencumbered by the CEO Portal limitation, the request is extremely broad.  Still, given

21 the claims and conduct alleged in the complaint, it's clear that the wire transfer policies go to the

22 heart of plaintiffs' claims; there is a significant amount of money in controversy; Wells Fargo has

23 better access to these documents relative to plaintiffs; Wells Fargo has significant resources; and

24 the documents appear important to resolving the issues in this case.  In light of these findings, the

25 Court will order Wells Fargo to conduct another reasonable search for responsive documents,

26 limited to transfer policies and procedures regarding wire transfers that are flagged for suspicious

27 or irregular activity.  This request, as limited, is relevant and proportional.

28

1        The court overrules Wells Fargo's propriety and confidentiality objections because these

2    concerns can be ameliorated through the parties' protective order.

3        **V.      ECF No. 51**

4        In this motion, plaintiffs seek to compel defendants to search Darrall's and Rico's personal

5    devices, including cell phones and non-Wells Fargo email accounts, for ESI relevant and responsive

6    to plaintiffs' discovery requests.  Plaintiffs assert that any search should be conducted by counsel.

7        In response, defendants argue that Wells Fargo already searched Darrall's and Rico's business

8    email accounts; that the individual defendants were instructed of their duty to preserve and not

9    destroy any documents related in any way to Jasso, Maza, or Maza's accounts; that Rico and Darrall

10   already searched their personal cell phones and personal email accounts; that the employees did not

11   have company-issued cell phones or computers; that in August or September 2020 Rico traded in his

12   cell phone for a new, upgraded cell phone; that on June 28, 2021, defense counsel conducted a search

13   of Darrall's and Rico's personal emails and cell phones and did not find any additional relevant

14   documents.

15       In reply, plaintiffs state that their motion has seemingly been rendered moot because of

16   counsel's decision to search Rico's and Darrall's devices.  As a result, they request Rule 37 sanctions

17   for failing to participate in the meet-and-confer process in good faith and forcing plaintiffs to file their

18   motion.  Further, plaintiffs claim that despite the new search, defendants' production of ESI remains

19   incomplete for three reasons: first, it is unclear whether Rico's previous phone was ever preserved for

20   searching and examination prior to Rico trading it in last fall; second, it is unclear what parameters

21   were applied to the data collection performed by Wells Fargo's counsel on Rico's phone; third, it is

22   unclear whether Rico still has access to the text messages and emails sent from his prior cell phone.

23       The Court finds that the non-mooted issues relating to the ESI are not ripe for adjudication

24   because they were necessarily raised for the first time in reply.  Therefore, the Court will order the

25   parties to meet and confer on issues raised in plaintiffs' reply.  If the parties cannot come to an

26   agreement, plaintiffs may file the appropriate motion.

27       Further, the Court is unwilling to issue Rule 37 sanctions at this time because this issue was

28   likewise raised for the first time in reply.  The Court understands that the information giving rise to

1    the sanctions request was apparently not revealed until defendants' response.  However, the Court is

2    not willing to issue sanctions without hearing from defendants first.  Therefore, without prejudging

3    the merits or outcome of the sanctions request, the Court will direct plaintiffs to file the appropriate

4    motion so the Court has the benefit of full briefing.  The Court notes, however, that it makes no

5    determination today regarding whether a search by counsel was necessary for defendants to meet their

6    discovery obligations.

7           Finally, in their reply plaintiffs emphasize their uncertainty surrounding the email retention

8    policy applicable to Darrall's emails.  This issue is addressed in the Court's ruling on ECF No. 51.  In

9    other words, to the extent defendants state that emails no longer exist because of the document

10   retention policy, those policies (in effect during the entirety of the events described in the complaint)

11   are relevant and must be produced.

12   **VI.    Conclusion**

13          IT IS THEREFORE ORDERED that plaintiffs' motion (ECF No. 50) is GRANTED in

14   part and DENIED in part as stated in this order.

15          IT IS THEREFORE ORDERED that plaintiffs' motion (ECF No. 51) is GRANTED in

16   part and DENIED in part as stated in this order.

17          IT IS THEREFORE ORDERED that plaintiffs' motion (ECF No. 52) is DENIED as moot.

18   The parties are directed to meet and confer on the issues raised in plaintiffs' reply.  Plaintiffs'

19   request for Rule 37 sanctions is denied without prejudice.

20          IT IS FURTHER ORDERED that by August 20, 2021 defendant Wells Fargo shall submit

21   in-camera those documents that it has withheld on the basis of the SAR privilege.  Defendants are

22   permitted to annotate the submitted documents with explanations for how the SAR privilege

23   applies.  Defendants here are represented by the same firm representing defendant Bank of

24   America, N.A., in *Zeitlin v. Bank of America, N.A.*, No. 2:18-cv-01919-RFB-BNW.  The Court's

25   intent is for defendants here to make an in-camera submission similar to the one made in *Zeitlin*.

26          DATED: August 11, 2021.

27                                                          _____
                                                            Brenda Weksler
28                                                          United States Magistrate Judge