**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| Mauricio Jasso, *et al.*, | Case No. 2:20-cv-00858-RFB-BNW |
| Plaintiffs, | |
| v. | **ORDER re In-Camera Review** |
| Wells Fargo Bank, N.A., *et al.*, | |
| Defendants. | |

As part of its September 30, 2021 Order, this Court directed Defendant Wells Fargo Bank to provide certain documents to the Court for in-camera review to determine whether Wells Fargo had properly wielded the Suspicious Activity Report ("SAR") privilege. ECF No. 103. Wells Fargo complied with the Order and submitted policies entitled "Unusual Activity Referral and Suspicious Activity Report Policy" published on different dates (January 4, 2014, July 17, 2014, April 20, 2018, June 6, 2018, November 5, 2018, and February 19, 2020). *See* ECF No. 111.

**I.   Background**

Plaintiffs allege that non-party Daniel Maza-Noriega ("Maza") conducted a Ponzi scheme with assistance and participation by Defendant Wells Fargo. Maza and Plaintiffs essentially grew up together as friends and family in Mexico. Later in life, Maza and Plaintiff Mauricio Jasso established JAMA as 50-50 co-owners. JAMA was used as a vehicle for Plaintiffs to invest funds into Maza's own entity, First Prime Mortgage ("FPM"). Plaintiffs were led to believe that their funds were being invested by Maza and FPM into foreclosed U.S. real estate. The supposed plan was that FPM would renovate the real estate and sell it at a premium to a Chinese investment company.

According to the JAMA investment agreements, investors would receive a 30 percent or higher return. However, Plaintiffs allege that once funds reached the FPM Wells Fargo accounts, Maza would simply funnel his investors' millions into one of his other multitude of Wells Fargo

checking accounts and, soon after, he would use the money to pay off his wife's American Express Black Card or wire the money offshore to Canada, Hong Kong, Mexico, Russia, or somewhere in Europe.

According to Plaintiffs, Maza initially tried opening the JAMA account at Citibank, Bank of America, and JPMorgan Chase. However, each of these banks closed Maza's accounts after only one month, allegedly because of fraudulent activity. Maza eventually turned to Wells Fargo, where he maintained the FPM accounts for some time. Wells Fargo employee/individual Defendant Katherine Darrall supposedly insisted that Citibank was at fault for the closure of Maza's accounts, and she explained to Jasso that Maza was an "excellent performer" and "one of our best clients." Individual Defendant Jose Rico was also a Wells Fargo banker during the events alleged in the complaint, and he supposedly joined Darrall in making statements about the success of FPM and Maza. Jasso conveyed these supposed assurances to the other Plaintiffs.

Based on these assurances, Plaintiffs invested additional millions into Wells Fargo's accounts. Eventually, after Plaintiffs invested $25 million (and reinvested $15 million) into FPM, Jasso demanded to see the FPM account balances. Jasso revealed that the accounts contained a negative balance of $1,000. The underlying lawsuit followed, and Plaintiffs assert claims for negligence, aiding and abetting breach of fiduciary duty, fraudulent misrepresentation, fraudulent inducement, fraudulent concealment, and civil conspiracy.

## II. Legal Standard

Discovery is broad. *Jackson v. Montgomery Ward & Co.*, 173 F.R.D. 524, 528 (D. Nev. 1997). Parties may obtain discovery on any nonprivileged matter relevant to any party's claim or defense and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). The court "must" limit discovery if it determines that the discovery sought "is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C). The court has broad discretion to permit or deny discovery, and its decision will not be disturbed "except upon the clearest showing" that the denial "results in actual and substantial prejudice to the complaining litigant." *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002) (internal quotation marks and citations omitted).

**a. The Bank Secrecy Act and Suspicious Activity Reports**

Under the Bank Secrecy Act ("BSA"), the Secretary of the Treasury "may require any financial institution . . . to report any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1).

The Financial Crimes Enforcement Network ("FinCEN") and the Office of the Comptroller of the Currency ("OCC") have each issued relevant regulations. FinCEN requires a SAR when a transaction involves at least $5,000 and "the bank knows, suspects, or has reason to suspect that . . . [t]he transaction involves funds derived from illegal activities or is intended or conducted in order to hide or disguise funds or assets derived from illegal activities." 31 C.F.R. § 1020.320(a)(2)(i). Similarly, the OCC requires a bank to file a SAR when it "detect[s] a known or suspected violation of Federal law or a suspicious transaction related to a money laundering activity or a violation of the [BSA]." 12 C.F.R. § 21.11(a). Banks file their SARs with FinCEN. 31 C.F.R. § 1020.320(b)(2); 12 C.F.R. § 21.11(c).

If a bank makes a SAR, then it and its employees are prohibited from "notify[ing] any person involved in the transaction that the transaction has been reported." 31 U.S.C. § 5318(g)(2)(A)(i). The implementing regulations by the FinCEN and OCC each similarly prohibit a bank from disclosing a SAR, but also any information that "would" reveal the existence of a SAR. 31 C.F.R. § 1020.320(e)(1)(i); 12 C.F.R. § 21.11(k)(1)(i). Both the FinCEN and OCC have issued interpretive guidance stating that the disclosure prohibitions extend to no-SAR decisions as well. 75 Fed. Reg. 75593, 75595 (Dec. 3, 2010) ("An institution also should afford confidentiality to any document stating that a SAR has not been filed."); 75 Fed. Reg. 75576, 75579 (Dec. 3, 2010) ("By extension, a national bank also must afford confidentiality to any document stating that a SAR has not been filed."). The logic driving both of these interpretations is that if a bank were able to disclose "information when a SAR is not filed, institutions would implicitly reveal the existence of a SAR any time they were unable to produce records because a SAR was filed." 75 Fed. Reg. 75593, 75595 (Dec. 3, 2010); *accord* 75 Reg. 75576, 75579.

Stated plainly, then, "the key query is whether any . . . documents suggest, directly or indirectly, that a SAR was or was not filed." *In re JPMorgan Chase Bank, N.A.*, 799 F.3d 36, 43

(1st Cir. 2015) (citations omitted). When the OCC promulgated its final regulations, it emphasized that "the strong public policy that underlies the SAR system as a whole . . . leans heavily in favor of applying SAR confidentiality not only to a SAR itself, but also in appropriate circumstances to material prepared by the national bank as part of its process to detect and report suspicious activity, regardless of whether a SAR ultimately was filed or not." 75 Fed. Reg. 75576-01, 75579 (Dec. 3, 2010). To that end, some courts have held that "documents which have been prepared as part of a national bank's process for complying with federal reporting requirements are covered by the SAR privilege." *Lan Li v. Walsh*, No. CV 16-81871, 2020 WL 5887443, at *2 (S.D. Fla. Oct. 5, 2020) (citation omitted).

There are limitations to the scope of the SAR. The regulations provide that the disclosure prohibition does not extend to "[t]he underlying facts, transactions, and documents upon which a SAR is based." *See, e.g.,* 31 C.F.R. § 1020.320(e)(1)(ii)(A)(2); *accord Cotton v. PrivateBank and Trust Co.*, 235 F. Supp. 2d 809, 815 (N.D. Ill. 2002) ("Documents which give rise to suspicious conduct . . . are to be produced in the ordinary course of discovery because they are business records made in the ordinary course of business"). Plus, the use of the term "would" in the regulations has been construed to mean that "review of the document must" reveal "with effective certainty the existence of a SAR." *First Am. Title Ins. Co. v. Westbury Bank*, 2014 WL 4267450, at *2 (E.D. Wis. Aug. 29, 2014). "[I]nformation that, with aid of supposition or speculation, might tend to suggest to a knowledgeable reviewer whether a SAR was filed, is not privileged." *Id*. To the extent the SAR privilege applies, it "is unqualified and cannot be waived." *Id*.

### III.   In-Camera Review

After considering the relevant standards, the Court finds that these documents are not covered by the SAR privilege. These policies do not "suggest, directly or indirectly, that a SAR was or was not filed." *In re JPMorgan Chase Bank, N.A.*, 799 F.3d at 43. The Court has also reviewed the case cited by Defendant Wells Fargo at ECF No. 81 at 8 n.3 (*S.E.C. v. Stanford Int'l Bank, Ltd.*, No. 3:09-cv-00298-N, 2014 WL 3702558, at *6 (N.D. Tex. July 25, 2014)). Defendant Wells Fargo has not argued that Plaintiffs' possession of certain bank records could reveal that a SAR was or was not filed when considered in conjunction with these policies.

**IV.    Conclusion**

Having reviewed Wells Fargo's in-camera submission and considered the relevant legal standards, the Court finds that Wells Fargo must produce the policies in question to Plaintiffs within 10 days of this Order. The parties are to meet and confer within 7 days of this Order and ensure there is a mutual understanding as to the handling of these policies considering the confidentiality of these documents.

DATED: December 27, 2021.

BRENDA WEKSLER
UNITED STATES MAGISTRATE JUDGE