ANTHONY P. SGRO (Nev. Bar No. 3811)
COLLEEN N. SAVAGE (NEV. BAR NO. 14947)
**SGRO & ROGER**
2901 El Camino Ave., Ste. 204
Las Vegas, Nevada 89102
Telephone: 702.384.9800
TSgro@SgroandRoger.com
CSavage@SgroandRoger.com

COURTNEY CAPRIO (*Admitted Pro Hac Vice*)
Florida Bar No. 933961
**KELLY UUSTAL, PLC**
500 N. Federal Highway, Suite 200
Fort Lauderdale, Florida 33301
Telephone: 954-522-6601
cac@kulaw.com
*Attorneys for* PLAINTIFFS

Jeffrey W. Gutchess (*Admitted Pro Hac Vice*)
Florida Bar No. 702641
Joanna Niworowski (*Admitted Pro Hac Vice*)
Florida Bar No. 1031440
Amanda Suarez (*Admitted Pro Hac Vice*)
**AXS LAW GROUP, PLLC**
2121 NW 2nd Avenue, Suite 201
Miami, Florida 33127
Jeff@axslawgroup.com
joanna@axslawgroup.com
amanda@axslawgroup.com

*Attorneys for* PLAINTIFFS

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| ANDREW D. ZARON, solely in his capacity as the Court-Appointed Receiver of JAMA INVESTMENT GROUP, INC., *et al.*,<br><br>Plaintiff(s),<br><br>vs.<br><br>WELLS FARGO BANK, N.A., KATHERINE DARRALL, and JOSE RICO;<br><br>Defendant(s). | Case Number<br>2:20-CV-00858-CDS-BNW<br><br>**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

1

Plaintiffs, Andrew Zaron, solely in his capacity as the Court-Appointed Receiver of JAMA Investment Group, Inc., Mauricio Jasso, Guillermo Sesma, Sylvia Martinez Salinas, Belisario Jasso Baldini, Javier Ramirez Lares, Antonio Bachaalani, Rodrigo Fernandez, Juan Romero, and Bernardo Villacecias (collectively, "Plaintiffs"), by and through undersigned counsel, respectfully move for the entry of summary judgment in their favor on their Aiding and Abetting Breach of Fiduciary Duty claim against all Defendants pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56-1 of the District of Nevada Local Rules. This Motion is based upon the following Memorandum of Points and Authorities and Statement of Undisputed Material Facts.

Dated this 24th day of January, 2024.

SGRO & ROGER

*/s/ Colleen N. Savage*

ANTHONY P. SGRO
COLLEEN N. SAVAGE
**SGRO & ROGER**
2901 El Camino Ave., Ste. 204
Las Vegas, Nevada 89102

AND

COURTNEY CAPRIO (*Admitted Pro Hac Vice*)
Florida Bar No. 933961
**KELLY UUSTAL, PLC**
500 N. Federal Highway, Suite 200
Fort Lauderdale, Florida 33301
Telephone: 954-522-6601
cac@kulaw.com

JEFFREY W. GUTCHESS (*Admitted Pro Hac Vice*)
COURTNEY CAPRIO (*Admitted Pro Hac Vice*)
JOANNA NIWOROWSKI (*Admitted Pro Hac Vice*)
AMANDA SUAREZ (*Admitted Pro Hac Vice*)
**AXS LAW GROUP, PLLC**
2121 NW 2nd Avenue, Suite 201
Miami, Florida 33127

*Attorneys for Plaintiffs*

2

## MEMORANDUM OF POINTS AND AUTHORITY

### I. STATEMENT OF UNDISPUTED MATERIAL FACTS

**A. UNDISPUTED MATERIALS FACTS: DANIEL MAZA'S PONZI SCHEME**

1. From approximately mid-2013 to 2019, Plaintiffs were the victims of a fraudulent Ponzi scheme run by non-party Daniel Maza ("Maza"). DE 1-1, ¶ 14.

2. Plaintiffs were defrauded of over $15 million as a result of Maza's fraudulent scheme. **Exhibit 1** at 154–56 (Excerpt of Plaintiffs' Eighth Amended Rule 26 Initial Disclosure).

3. Maza was a childhood friend of Plaintiff Mauricio Jasso ("Jasso") and convinced Jasso to invest in his ostensible real estate investment company, First Prime Management, Inc. ("FPM"). **Exhibit 2** at 69:10-18, 76:7-21 (Excerpts of Aug. 24, 2021 M. Jasso Dep. Tr.).

4. Maza and Jasso established JAMA Investment Group, Inc. ("JAMA") in May 2013 as 50/50 co-owners. *Id.* at 8:6-14. Jasso was also an investor in JAMA. *Id.* at 18:11-20.

5. JAMA was intended to be used as a vehicle for Jasso's friends and family to invest funds into FPM. Plaintiffs (save for Bachaalani, who invested directly in FPM) would make investments into JAMA and the money would be almost immediately transferred into the FPM Wells Fargo account, over which Maza had exclusive dominion and control. **Ex. 2** at 44:20-25 (Excerpts of Aug. 24, 2021 M. Jasso Dep. Tr.); **Exhibit 3** at 115:11-14 (Excerpts of Aug. 25, 2021 JAMA Corporate Representative Dep. Tr.).

6. Plaintiff Antonio Bachaalani was one of Maza's investors who invested his own money into Maza's Ponzi scheme by using his entity Abadai Investments Inc.as a vehicle through which he made his investments into FPM. **Exhibit 4** at 7 (Sept. 15, 2021 A. Bachaalani Dep. Ex. 1).

7. Plaintiffs' investor agreements with JAMA stated that the investors "w[ould] receive a thirty percent (30%) contractual per annum interest in their investment" with some investor agreements offering an even higher return. *See, e.g.*, **Exhibit 5** at JASSO-00001925 (Apr. 26, 2018 Investment Agreement between JAMA and Guillermo Sesma Suarez).

8. Plaintiffs were led to believe that their funds were being invested by Maza into foreclosed residential real estate, which was to be renovated and resold at a profit. **Ex. 3** at 52:13-15 (Excerpts

of Aug. 25, 2021 JAMA Corporate Representative Dep. Tr.). To that end, Maza would routinely provide Plaintiffs with payment schedules on the properties which purportedly comprised FPM's real estate portfolio and individualized spreadsheets laying out, in detail, purportedly where investor funds had been allocated and the profits that had purportedly been accrued. *Id.* at 148:9-19; *see, e.g.*, **Exhibit 6** (Certified Translation of JASSO-00002761).

9. Maza also informed Plaintiffs and showed them contracts purporting to show that a Chinese investment fund was buying up tranches of FPM's real estate portfolio. *See, e.g.*, **Exhibit 7** (JASSO-00040418); **Exhibit 8** (JASSO-00040434).

10. All the documentation provided by Maza to Plaintiffs was fraudulent. Maza purchased and sold very little residential real estate with Plaintiffs' investments. **Ex. 2** at 68:7-17 (Excerpts of Aug. 24, 2021 Mauricio Jasso Dep. Tr.).

11. Maza instead used the funds received from Plaintiffs to pay previous investors as part of his Ponzi scheme or misappropriated them to pay for his own personal expenses. *Id.* at 96:13-19.

12. Bank of America, Citibank and JPMorgan Chase all exited Maza's FPM and JAMA accounts for fraud or suspicious activity due to signs of money laundering and fraud. **Exhibit 9** at 89:12-92:12 (Excerpts of Jan. 20, 2022 A. Levy Dep. Tr., filed under seal); **Exhibit 10** (Jan. 20, 2022 A. Levy Dep. Ex. 12, filed under seal); **Exhibit 11** (Jan. 20, 2022 A. Levy Dep. Ex. 15, filed under seal); **Exhibit 12** (Jan. 10, 2022 L. Cleveland Dep. Pls.' Ex. 4, filed under seal); **Exhibit 13** at 43:17-23 (Excerpts of Dec. 27, 2022 C. Cacciatore Dep. Tr., filed under seal).

**B. UNDISPUTED MATERIAL FACTS: DEFENDANTS' KNOWLEDGE OF MAZA'S FIDUCIARY DUTY TO PLAINTIFFS**

1. Maza was listed as the sole owner of that company on the FPM Wells Fargo account opening documents. **Composite Exhibit 14** (FPM Account Opening Documents, filed under seal). The account opening documents Wells Fargo possessed included copies of FPM's Articles of Incorporation, which showed Maza as the President, Secretary, Treasurer, Director, Registered Agent, and Incorporator of the entity. *Id.*

2. On the JAMA Wells Fargo account opening documents, Maza was listed as the "Owner with Control of the Entity" of FPM and the 50/50 owner of that company with Jasso. **Composite Exhibit 15** (JAMA Account Opening Documents, filed under seal). The account opening documents Wells Fargo possessed included copies of JAMA's articles of incorporation, which showed Maza as the President, Treasurer, Incorporator, and Registered Agent of the entity. *Id.*

3. Defendant Wells Fargo also knew that Maza purported to run a real estate business based on "FPM's account applications [that] note the [business'] industry as 'Real Estate, Rental and Leasing' and the description of the business as Real Estate." **Exhibit 17** at 11-12 (Excerpt of Wells Fargo's Response to Plaintiffs' First Set of Interrogatories).

4. Defendant Darrall likewise "believed that Maza was the owner and manager of a real estate investment business, and that FPM was in the business of buying, flipping, renting and/or selling real estate properties in the United States and Mexico." **Exhibit 16** at 12-13 (Excerpt of Darrall's Response to Plaintiffs' First Set of Interrogatories).

5. Defendant Darrall testified that she understood Maza's businesses to be involved with rental and investment properties. For example, she testified that "AM Investment Capital's business . . . they did, like it mentions here [in the account opening application], rental properties, and he did, like, investment properties." **Exhibit 18** at 63:22-64:1 (Excerpts of Mar. 17, 2022 K. Darrall Dep. Tr., filed under seal); **Exhibit 19** (Mar. 17, 2022 K. Darrall Dep. Ex. 7, filed under seal). Similarly, she testified that Maza similarly used First Prime Management for "real estate investment properties." **Ex. 18** at 70:18-25; **Exhibit 20** (March 17, 2022 K. Darrall Dep. Ex. 8, filed under seal).

6. Defendant Darrall also testified that "[her] understanding was [that] First Prime was . . . the one that he would do a majority of his transactions out of. But the additional accounts that had the other . . . owners on were . . . business they were doing together. So if there was a property they were either buying together, or he would broker a deal for them. A majority of his clients didn't live either in state or out of the country, so he would help transact on their behalf as well." **Ex. 18** at 100:18-101:6.

7. Darrall also knew Maza was handling investor funds because she facilitated numerous Outgoing Wire Transfer Request forms where she indicated the purpose for the wire was for returning investor funds:

a. For instance, Defendant Darrall completed the 7/8/15 Outgoing Wire Transfer Request form ("Wire Request") to wire ██████████████████████████████████████ ████████████████████████████████████████████ **Exhibit 21** (March 17, 2022 K. Darrall Dep. Ex. 25, filed under seal).

b. On that same day, Defendant Darrall completed the 7/18/15 Wire Request to wire ████████████████████████████████████████████████████████ ████████████████████████." **Exhibit 22** (March 17, 2022 K. Darrall Dep. Ex. 26, filed under seal).

c. Defendant Darrall completed the 9/9/15 Wire Request to ████████ ████████████████████████████████████ **Exhibit 23** (March 17, 2022 K. Darrall Dep. Ex. 27, filed under seal).

8. Lucy Herrera, Maza's assistant, confirmed that Maza "introduc[ed] all of [his] investors to" Defendant Darrall and that "[s]he [] help[ed] open accounts for them, set up new business accounts, personal accounts for them" and that as a result of performing these banking activities "she knew that [Maza] was investing their money." **Exhibit 24** at 27:7-12 (Excerpts of Sept. 14, 2021 L. Herrera Dep. Tr.).

9. Other Wells Fargo bankers likewise facilitated wire transfers for Daniel Maza that also indicate that the bankers had knowledge that Maza was handling investor funds:

a. Alexander Nelson, a business banker, completed the 3/20/17 Wire Request to wire ████████████████████████████████████████████████████ ████████████████████████." **Exhibit 25** (Jan. 23, 2023 Alexander Nelson Dep. Ex. 3, filed under seal).

b. The next day, Nelson completed the 3/21/17 Wire Request to wire ██████████ ██████████████████████████████████████████

[BLACK REDACTION]." **Exhibit 26** (Jan. 23, 2023 Alexander Nelson Dep. Ex. 5, filed under seal).

    c.  Nataly Cortez Delcid completed the 4/21/15 Wire Request to wire [BLACK REDACTION] **Exhibit 27** at WF-00006646. (WF-00006646, filed under seal).

    d.  Jonah Micah Benitez completed the 12/22/16 Wire Request to wire [BLACK REDACTION]" **Exhibit 28** (WF-00007002, filed under seal).

10. Nelson understood the nature of FPM's business to be "commercial real estate investments." **Exhibit 29** at 97:9-15 (Excerpts of Jan. 23, 2023 A. Nelson Dep. Tr., filed under seal).

11. Ilona Mitchell, Maza's second relationship manager, likewise knew that Maza's business was "for real estate investment." **Exhibit 30** at 186:24-187:2 (Excerpts of Aug. 18, 2021 Ilona Mitchell Dep. Tr., filed under seal).

12. Darrin Hansen, Maza's first relationship manager, "understood [Maza] to be in real estate investment" business. **Exhibit 31** at 48:9-13 (Excerpts of Jan. 13, 2022 Darrin Hansen Dep. Tr.).

13. Ursula Gusman, a business associate, testified that "Maza said" that "he was getting money from investors[.]" **Exhibit 32** at 81:20-82:5 (Excerpts of Sept. 30, 2021 Ursula Gusman Dep. Tr.).

14. Defendant Rico, a business banker, knew Maza "owned a . . . property investment company" that invested in "[r]eal estate." **Exhibit 33** at 13:6-23 (Excerpts of March 15, 2022 J. Rico Dep. Tr., filed under seal).

15. Finally, numerous checks that explicitly stated they were made for investment purposes from various entities were deposited into the FPM account at Wells Fargo, including the following checks from Pente Corp's Wells Fargo account, which bore the same address as FPM's address:

    a.  A [BLACK REDACTION] **Exhibit 34** (WF-00004061, filed under seal).

    b.  A [BLACK REDACTION] **Exhibit 35** (WF-00004097, filed under seal).

c. A ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓" **Exhibit 36** at WF-00008744 (Oct. 25, 2022 Michael Grossman 30(b)(6) Dep. Ex. 31, filed under seal).

d. A ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓." *Id.* at WF-00008743 (Oct. 25, 2022 Michael Grossman 30(b)(6) Dep. Ex. 31).

e. A ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓" *Id.* at WF-00008745 (Oct. 25, 2022 Michael Grossman 30(b)(6) Dep. Ex. 31).

f. A ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓ *Id.* at WF-00008747 (Oct. 25, 2022 Michael Grossman 30(b)(6) Dep. Ex. 31).

g. A ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓." **Exhibit 37** (WF-00008839, filed under seal).

h. A ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓."

**Exhibit 38** (WF-00008838, filed under seal).

i. A ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**Exhibit 39** (WF-00008840, filed under seal).

j. A ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**Exhibit 40** (WF-00008837, filed under seal); **Exhibit 41** (WF-00008841, filed under seal).

**C. UNDISPUTED MATERIAL FACTS: DEFENDANTS' ACTUAL KNOWLEDGE AND SUBSTANTIAL ASSISTANCE OF MAZA'S BREACH OF FIDUCIARY DUTY**

**1.** *Wells Fargo Had Actual Knowledge of Maza's Fraud.*

a. Wells Fargo's employees, including mainly Defendant Darrall, assisted Maza in completing the Business Account Applications and opening 29 different accounts between September 2014 and November 2018.[1] **Exhibit 42** at 9 (Oct. 28, 2022 Amy Croke 30(b)(6) Dep. Ex. 2, filed

---

[1] Defendant Darrall also helped open the account for Pente Corp, for which Maza was listed as the registered agent. **Composite Exhibit 61** (Pente Corp Account Opening Documents, filed under seal). Plaintiffs include Pente Corp as a Maza account due to this relationship and the fact that it shared the same Teco Avenue address as all of his other accounts. *Id.*

under seal). All of the 30 Maza-related Wells Fargo accounts (including the 7 opened on September 9, 2014) shared the same 4775 West Teco Avenue, #220, Las Vegas, Nevada address, as did the multitude of Maza's Mexican investors' individual accounts also eventually opened by Defendant Darrall.[2] *Id.*; **Composite Ex. 14**; **Composite Ex. 15**; **Composite Exhibit 43-60** (filed under seal). (

b.    Lucy Herrera, Maza's assistant testified that "most of [the investors] were using the office address as the mailing address because they lived in Mexico." **Ex. 24** at 258:21-23; **Exhibit 62** (Sept. 14, 2021 Lucy Herrera Dep. Ex. 19).

c.    Hansen, Maza's initial relationship manager, wanted Defendant Darrall to open the Maza accounts to "help[] her in getting credit for opening the accounts." **Exhibit 63** (March 17, 2022 Katherine Darrall Dep. Ex. 17).

d.    In June 2014, Wells Fargo had initially blocked Defendant Darrall from opening a business account for Maza's AM Investment Capital entity because of a "fraudulent activity" reported by Bank of America, which was shown on a risk screen with information provided by Early Warning Services, a fraud monitoring service for banks. **Exhibit 64** at WF-9035 (Oct. 28, 2022 Amy Croke 30(b)(6) Dep. Ex. 3, filed under seal); **Ex. 18** at 52:1-7.

e.    Defendant Darrall testified that the fraudulent activity alert "was under Daniel's information, not under the business" and she memorialized this with a handwritten note: "Fraudulent Activity 2/1/10 B of A"[3] on the Authorization for Information form that Maza had signed. *Id.* at 53:10-15, 54:9-14; **Ex. 64** at WF-9035.

f.    Three months went by until Maza returned to Defendant Darrall on September 9, 2014, when he made a second attempt to open the AM Investment Capital account at Wells Fargo. **Ex. 18** at 60:7-62:7; **Exhibit 19**.

g.    Yet the initial Early Warning Services alert remained on the AM Investment Capital account, which generated a fraud alert during the account opening process on September 10, 2014

---

[2] While certain account opening information, such as the address, for several entities (Baksoma, ESG Transportation, GMP Capital, Videa, and 702 Prime) was redacted by the bank, it is believed that all of them would show Maza's address if the redactions were removed.

[3] BoA's Risk Account Closure Unit had previously closed Maza's personal account in 2010. **Exhibit 9** at 15:4-8, 107:6-15.

for "Loss ████████████████████ which means ██████████████████████ ████████████████████████ the internal Wells Fargo name for Early Warning Services. **Exhibit 65** at 201:10-14 (Excerpts of Oct. 25, 2022 M. Grossman 30(b)(6) Dep. Tr. , filed under seal). This fraud alert – that "there was a possible match for fraud-related news" – was cleared by Wells Fargo's fraud analyst Aimee Mosely with the notation: ████████████████████ ████████████████████████████████████████████ **Exhibit 66** (WF-00009609, filed under seal).

h. Wells Fargo proceeded to open Maza's two AM Investment Capital accounts[4] after Wells Fargo had completely blocked Maza from opening accounts due to fraud at Bank of America, along with five additional accounts –three for First Prime Management and two for Rpicard Holding– which were also opened on September 9, 2014. **Ex. 42** at 9.

i. Strikingly, the FPM account #9109 – the main vehicle for Maza's fraud – began alerting for fraud almost immediately after it was opened, alerting 6 times over 5 days:[5]

    i. The FPM 9109 account alerted for fraud on September 15, 2014 at 10:53pm because ██████████████████████████;

    ii. The FPM 9109 account alerted for fraud on September 15, 2014 at 11pm because of ████████████;

    iii. The FPM 9109 account alerted for fraud on September 15, 2014 at 11pm and again on September 16, 2014 at 11:58pm because of ██████████████;

    iv. The FPM 9109 account alerted for fraud on September 17, 2014 at 10:06am because of ████████████████████;

    v. The FPM 9109 account alerted for fraud on September 19, 2014 at 2:34pm because ████████████████████████████ ████████. **Ex. 66**.

---

[4] One of these accounts, account #4753 remained dormant and was closed a month later. **Ex. 42** at 9.

[5] The FPM 9109 account alerted two more times, on March 5, 2015 at 9:39pm because of ██████ ████████████████████, and on April 27, 2018 at 9:05am because of ██████ ████████████████████. **Ex. 66** (WF-00009609).

j. In 5 days from September 15 to 19, 2014, $511,758.91 dollars moved in and out of the FPM #9109 account. **Exhibit 67** (WF-00002504, filed under seal).

k. The FPM account opening documents showed $150,000 in annual gross sales. **Composite Ex. 14** at WF-00000193.

l. In clearing the 6 FPM #9109 fraud alerts that occurred immediately after account opening, Wells Fargo ████████████████████████████████████. **Exhibit 69** at 14:14-15:6 (Excerpts of Feb. 25, 2022 Jada Burch Dep. Tr. , filed under seal) ("███████████████████████████████████████████████").

m. Nonetheless, all six of the September 2014 FPM #9109 fraud alerts were cleared by Wells Fargo.[6] **Ex. 66**.

n. Numerous other accounts owned by Maza also alerted throughout the duration of the Ponzi scheme. **Ex. 66**.[7] For example:

> i. On September 10, 2014 at 8:04 AM, Maza's AM Investment Capital account ending in 9075 alerted for fraud because of ████████████████

---

[6] The alert generated on the FPM #9109 account on September 15, 2014 at 11:00pm does not indicates an "Open" "Case Status" but lists September 15, 2014 as the "Close Date." **Ex. 66**.

[7] On January 21, 2015 at 11:07 AM, the Mitra Investment Fund LLC account ending in 9026 alerted because ████████████████████████████████████. *Id.*

On January 24, 2017 at 3:10 PM, the ESG Transportation, LLC account ending in 0174 alerted because of a ████████████████████████ *Id.*

On April 27, 2018 at 9:04 AM, the Jama Investment Group Inc. account ending in #3902 alerted because of ████████████████████████████████████████████. *Id.*

On August 3, 2018 at 12:14 AM, the ESG Transportation, LLC account ending in 4045 alerted because of ████████████████████ *Id.*

On December 20, 2018 at 10:26 AM, the Daniel Maza Paulina Honojosa-Alonso account ending in 6813 alerted because ████████████████████. *Id.*

On March 5, 2019 at 6:07 PM, the Daniel Maza Paulina Honojosa-Alonso account ending in 3902 alerted because ████████████████████████████████████████████████" Two days later, on March 7, 2019 at 2:37 PM the Daniel Maza Paulina Honojosa-Alonso account ending in 3902 alerted again ████████████████████████████████. *Id.*

■■■■■■■ *Id.*

ii. That same day, on September 10, 2014 at 11:23 PM Maza's Rpicard Holding Inc. account ending in 9117 alerted for fraud because ■■■■■■■ ■■■■■■■ *Id.*

o. Several of Maza's Wells Fargo accounts – JAMA Investment Group, RPicard Holdings Inc., Rpicard Group, Anncar Hauz Inc., Be Home, GMP Capital Investments LLC, Videa Business Group, and Pente Corp – were high-risk shell companies with no employees. **Composite Ex. 15; Composite Ex. 45; Composite Ex. 46**; **Composite Ex. 47**; **Composite Ex. 48**; **Composite Ex. 49**; **Composite Ex. 51**; **Composite Exhibit 61**.

p. Wells Fargo's corporate representative testified that a shell company is "an entity that's opened where there won't be actual operations." **Exhibit 70** at 228:20-23 (Excepts of Oct. 28, 2022 Amy Croke 30(b)(6) Dep. Ex. Tr. , filed under seal).

q. Wells Fargo considers shell companies to be "[o]ne of the highest" risk accounts for money laundering. **Ex. 69** at 74:20-25; **Ex. 65** at 120:20-121:6 ("Q. And does Wells Fargo also consider shell companies to be a high risk? A. Wells Fargo considers shell companies to be higher risk. Q. Higher risk? A. Yes. . . . I think in general, shell companies do pose a higher level of risk than non-shell companies.").

r. Wells Fargo disregarded that Maza's companies – all sharing the same Teco Avenue address – were shell companies and assigned Maza's accounts low-risk ratings. **Ex. 65** at 11-12.

s. Despite $940,222.26 going in and out of the FPM #9109 account from September 14, 2014 to October 9, 2014 and after he had opened numerous business accounts, Wells Fargo did not even deem Maza credit-worthy enough to extend him a business credit card. **Ex. 67**; **Exhibit 71** (WF-00002513, filed under seal). Specifically, on October 9, 2014, Wells Fargo rejected Maza for a

secured business credit card for FPM one month later, due to prior charge-off on his Wells Fargo account(s). **Exhibit 72** at 9 (Oct. 28, 2022 Amy Croke 30(b)(6) Dep. Ex. 7).

t. A charge-off of a Wells Fargo account is "████████████████████████████████████████████████████████████████████████████████████████████████." **Ex. 70** at 65:5-15.

u. If Wells Fargo ████████████████████████████████████ the customer is placed on the hot file "[a]nd that list precludes the person or entity from ever opening up an account again" which is "standard in the banking industry[,]" (**Exhibit 73** at 88:8-16, 153:10-17 (Excerpts of June 28, 2023 Catherine Ghiglieri Dep. Tr. , filed under seal)), and Wells Fargo's policy provides that the Hot File is: "████████████████████████████████████████████████████████████████████████████████████████████████ the decision to add a customer to the Hot File can prevent the customer from opening future accounts with Wells Fargo." **Exhibit 74** at WF-00010756 (WF-00010746, filed under seal).

v. During the Wells Fargo account opening process, "████████████████████████████████████████████████████████████████████████████." **Ex. 70** at 40:22-41:5.

w. Amy Croke, Wells Fargo's Rule 30b6 representative, testified that ████████████████████████████████████████████████████████████████. *Id.* at 42:5-9 ("████████████████████████████████████████████████████████████████████████")

x. According to Wells Fargo's branch manager's testimony, wire transfers sent out of the FPM account ████████████████████████████████████████████████████████████████. **Exhibit 75** at 304:21-305:4 (Excerpts of Sept. 29, 2021 Brian Monzon Dep. Tr. , filed under seal) ("████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████. **Ex. 70** at 191:10-19.

y. Multiple Wells Fargo bankers, including Defendant Darrall, personally approved wire transfers out of Maza's accounts requested by Maza (and Herrera) that constituted improper use of investor funds.[8] For example:

i. Defendant Darrall completed the 10/21/14 Wire Request to wire ████████ **Exhibit 76.** (March 17, 2022 Katherine Darrall Dep. Ex. 38, filed under seal).

ii. Defendant Darrall completed the 11/12/14 Wire Request to wire ████████ **Exhibit 77.** (March 17, 2022 Katherine Darrall Dep. Ex. 39, filed under seal).

iii. Defendant Darrall completed the 1/26/15 Wire Request to wire ████████ **Exhibit 78.** (March 17, 2022 Katherine Darrall Dep. Ex. 37, filed under seal).

iv. Defendant Darrall completed the 3/13/15 Wire Request to wire ████████ **Exhibit 79.** (March 17, 2022 Katherine Darrall Dep. Ex. 54, filed under seal).

v. Defendant Darrall completed the 2/11/16 Wire Request to wire ████████

---

[8] *See also, e.g.*, **Composite Exhibit 144** (March 17, 2022 Katherine Darrall Dep. Exs. 28, 29, 30, 31, 32, 33, 34, 35, 36, 41, 42, 43, 44, 46, 47, 48); **Exhibit 103** (Jan. 23, 2023 Alexander Nelson Dep. Ex. 8); **Exhibit 104** (Jan. 23, 2023 Alexander Nelson Dep. Ex. 9); **Exhibit 102** (Jan. 23, 2023 Alexander Nelson Dep. Ex. 13).

**Exhibit 80.** (March 17, 2022 Katherine Darrall Dep. Ex. 40, filed under seal).

**2.** *A Wells Fargo Banker Reported Maza's Fraud to His Branch Manager, At Least Once.*

k. After helping Maza and his cronies open up hundreds of accounts and account products at Wells Fargo, Darrall was promoted to branch manager and transferred to a different branch. **Ex. 18** at 174:8-10. Alexander Nelson became the senior business banking specialist who assisted Maza from 2016 to 2018. **Ex. 29** at 35:11-24. Nelson reported that Maza's accounts showed signs of "suspicious" activity and that he followed the appropriate procedures to report "something suspicious" about Maza's accounts in-person to his branch manager, at least one time and possibly more. *Id.* at 62:7-63:10, 71:1-11.

**3.** *Wells Fargo Repeatedly Investigated Maza for Financial Crimes.*

a. Wells Fargo has remained silent as to whether Nelson's direct report of Maza's suspicious activity ever resulted in an investigation of Maza, but it has admitted that it conducted five (5) investigations of Maza for financial crimes.

b. In particular, Wells Fargo's Financial Crimes Investigation department, which investigates money laundering and other financial crimes, directly investigated Maza's accounts at least on four separate occasions, along with a special review inquiry. **Ex. 65** at 314:5-10.

c. The first Financial Crimes direct investigation was conducted in April 2017 by Jada Burch, a financial crimes associate. *Id.* at 314:5-10.

d. The second Financial Crimes direct investigation was conducted in August 2017, also by Burch. *Id.*

e. Burch admitted that

. **Ex. 69** at 30:23-35:20, 63, 64, 68, 67, 84.

15

f. The third Financial Crimes direct investigation was conducted in December 2017 by Benjamin Clinard, an employee in the Financial Crime Investigation group. **Ex. 65** at 314:5-10.

g. On February 21, 2019, Carolyn Carlson, Financial Crimes Consultant, sent an email

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████."

**Exhibit 81** at WF-00008494 (Oct. 28, 2022 Amy Croke 30(b)(6) Dep. Ex. 8, filed under seal).

h. The fourth and final Financial Crimes direct investigation was conducted in April 2019 by Brian Luff, an employee in the Financial Crime Investigation group. **Ex. 65** at 314:5-10.

**4. *Wells Fargo Knew Investor Funds Were Being Used to Pay Maza's Wife's AMEX Card.***

a. Maza misappropriated $3,650,777.55 of investor funds in his Wells Fargo accounts to pay his wife's American Express card, and many automatic payments would cause the FPM account to be overdrawn, resulting in Wells Fargo contacting Maza so he could transfer funds to prevent an overdraft. **Exhibits 82-89** (Feb. 15, 2022 Monica Kennedy Dep. Exs. 6, 7, 14, 15, 21, 22, 29, 30); **Exhibit 90** at ¶ 5(a) (Dec. of M. Bour, filed under seal).[9]

b. In this regard, Wells Fargo bankers would actually review the transactions in Maza's accounts. Monica Kennedy, a business associate, testified that ████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████." **Exhibit 91** at 47:14-48:4 (Excerpts of Feb. 15, 2022 Monica Kennedy Dep. Tr. , filed under seal).

---

[9] Ms. Marcie D. Bour is currently out-of-the-country with limited Internet connectivity. Plaintiffs will submit her executed Declaration promptly upon her return.

c. Kennedy testified that "[█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████."*Id.* at 48:13-20.

d. When reviewing the report, Kennedy "█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." *Id.* at 49:3-16.

e. Brian Monzon, a Wells Fargo branch manager, testified that ████████████████████████████████████████████████████████████████████████████████████████████████████████████. **Ex. 75** at 58:19-59:6; **Ex. 70** at 174:13-21.

f. Wells Fargo constantly contacted Maza by email (at least approximately one hundred times) to allow him to cover the overdrafts after receiving notice he was on the overdraft report and reviewing his account activity. **Ex. 73** at 331 ("Q. Then you also note here 124 emails to ask Maza to cure overdrafts; correct? A. Yes.").

g. In this regard, Kennedy, along with other Wells Fargo business bankers, constantly emailed Herrera and Maza regarding overdrafts in Maza's accounts, many of which revealed that Maza was using investor funds to pay his wife's, Paulina Hinojosa Alonso, American Express credit card from the FPM account, which was apparent from the FPM #9083 transactions. **Exs. 82-90; Exhibit 115 (WF-00002727**, filed under seal**).**

5. *Wells Fargo Even Traced Investor Funds Stolen by Maza and Wired to Hong Kong.*

a. A Funds Approval System ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. **Exhibit 92** (WF-00018355, filed under seal) (emphasis added).

b. In approving the wire, ████████████████████████████████ ████████████████████████████ *Id.* at WF-00018356 (emphasis added).

c. Similarly, Martha Palomera wrote: "████████████████████ ██████ *Id.* (emphasis added).

d. On September 8, 2016, there was an incoming $500,000 wire transfer deposited into the JAMA #6813 account from Sylvia Martinez De Jasso. **Exhibit 93** at WF-00000074 (WF-00000074, filed under seal). On September 9, 2016, there was another incoming $500,000 wire transfer deposited into the JAMA #6813 account from Antonio Martinez Salinas. *Id.*

e. On September 15, 2016, a $950,000 online transfer from JAMA Investment Group #6813 account was deposited into the First Prime Management #9109 account. **Exhibit 94** at WF-00002831 (WF-00002831, filed under seal).

f. Those funds went in and out of the First Prime Management #9109 account to and from Rpicard Group #7141 and other Maza-related entities, and finally enough funds were accumulated in the First Prime Management #9109 account to make the necessary transfer of ████████████████████████████████████████████████ ████████████████████ *Id.* at WF-00002832; **Exhibit 95** at WF-00002613-14 (WF-00002613, filed under seal).

g. ███████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████. **Ex. 92**.

**6.  *Wells Fargo Continuously Authorized Suspicious Wire Transfers to Mexico, a High-Risk Geography by Wells Fargo's Own Measure.***

a. Wells Fargo continuously approved large wire transfers to Mexico, a high-risk jurisdiction, **Ex. 65** at 42:10-13, throughout the span of Maza's Ponzi scheme. By way of example, although Maza's accounts were constantly receiving and sending wires to and from Mexico:

i. Defendant Darrall completed the 3/13/15 Wire Request to wire ████████ ████████████████████████████████████████████████████ **Exhibit 96** (WF-00006594, filed under seal).

ii. Jonah Micah Benitez completed the 12/22/16 Wire Request to wire ████ ████████████████████████████████████████████. **Ex. 28**.

iii. Mehar Khan completed the 2/16/17 Wire Request to wire ████████████ ████████████████████████████████████████████████████████. **Exhibit 97** (WF-00007026, filed under seal).

iv. Defendant Rico completed the 12/27/18 Wire Request to wire $250,000.00 out of the JAMA #6813 account to Comercializadora Tivavi SA DE CV in Mexico. **Exhibit 98** (WF-00007170, filed under seal).

b. On June 11, 2018, Wells Fargo even approved a ████████████████ ████████████████████████████████████████████████████████████. **Exhibit 99** (Feb. 15, 2022 Monica Kennedy Dep. Ex. 24, filed under seal); **Ex. 91** at 157:22-158:3.

**7.** *Wells Fargo Knew Maza Was Misappropriating Investor Funds To Gamble*

a. Defendant Darrall ████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ **Exhibit 100** (Oct. 28, 2022 Amy Croke 30(b)(6) Dep. Ex. 17, filed under seal).

b. Nelson sent hundreds of thousands of dollars in wire transfers from the FPM account to the Wynn Las Vegas and Cosmopolitan casinos:

i. Nelson completed the 3/6/2017 Wire Request to wire ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ **Exhibit 101** (Jan. 23, 2023 Alexander Nelson Dep. Ex. 13, filed under seal).

ii. Nelson completed the 3/17/17 Wire Request to wire

███████████████████████████████████████████████████

Daniel Maza." **Exhibit 102** (Jan. 23, 2023 Alexander Nelson Dep. Ex. 8, filed under seal).

iii. Nelson completed the 3/17/17 Wire Request to wire

███████████████████████████████████████████████████

██████████████" **Exhibit 103** (Jan. 23, 2023 Alexander Nelson Dep. Ex. 9, filed under seal).

**8. *Maza's Relationship Managers Received Daily Fluctuation Reports***

**a.** Wells Fargo's corporate representative testified that Daily Fluctuation Reports are

███████████████████████████████████████████████████ **Ex. 70** at 111:20-112:7, 113:11-13.

**b.** ████████████████████████████████████████████

███████████████████████████ *Id.* at 112:14-17; 113:20-23.

**c.** For example, on September 14, 2017, as a result of the deposits on September 13, 2017

███████████████████████████████████████████████████

**Ex. 37**, **Ex. 38**, **Ex. 39**, a Balance Fluctuation Report was generated for the First Prime Management #9109 account. █████████████████████████████

███████████████████████████████. **Exhibit 104** (Oct. 28, 2022 Amy Croke 30(b)(6) Dep. Ex. 10, filed under seal).

**9. *Wells Fargo Had Maza's Tax Returns and Rejected Him for Mortgages and Loans.***

**a.** On April 16, 2017, FPM's 2014 and 2015 tax returns and Maza's 2014 tax return were sent to the bank by Herrera to Chisanga Chabala, Wells Fargo Home Mortgage Processor. **Exhibit 105** (JASSO-3629); **Exhibit 106** (JASSO-3630); **Exhibit 107** (JASSO-3646); **Exhibit 108** (JASSO-3647).

**b.** First Prime Management's U.S. Income Tax Returns for an S Corporation, Form 1120S for 2012 through 2018 stated for every year that the majority of First Prime Management's income was from "Deposits from Private Clients". The Cost of Goods Sold reported on the tax returns similarly showed as an expense against income, "Withdrawals to Private Clients". This clearly demonstrates that First Prime Management intentionally used investor funds to pay off other investors. **Ex. 90** at ¶ 5(b).

16. Herrera testified that when Maza "needed . . . a mortgage loan . . . [Defendant Darrall] referred him to" the appropriate Wells Fargo department for applying for a loan. **Ex. 24** at 27:18-22. Maza "went through the whole process" but "didn't get approved, and then [the loan department] communicated with [Darrall] why [Maza] didn't get approved." *Id.* at 27:23-25. Maza was not approved for the loan because "[h]e didn't have the money to be approved" because while there was "a lot of money from investors coming in" Maza "couldn't prove in [sic] paper that he had the money that he was saying he had." *Id.* at 27:23-28:6.

10. ***Wells Fargo Instructs Maza's Relationship Manager Not to Meet with Her Customers***.

**a.** On November 19, 2015, the OCC and Wells Fargo entered into a Consent Order, which identified "deficiencies in an internal control pillar of the Bank's program for Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") compliance covering the Wholesale Banking Group line of business." **Exhibit 109** (Oct. 28, 2022 Amy Croke 30(b)(6) Dep. Ex. 14).

**b.** Mitchell, Maza's second relationship manager, testified that Maza's accounts were in fact under remediation as a result of the 2015 OCC Consent Order, and that it was her job to thoroughly understand Maza's business, which she admitted that she never did. **Ex. 30** at 51:10-16, 76:10-19, 90:7-10: 119:1-10; **Exhibit 110** (Aug. 18, 2021 Ilona Mitchell Dep. Ex. 13, filed under seal).

c. Mitchell also testified that she was instructed not to meet with Maza by Wells Fargo management during remediation. **Ex. 30** at 63:3-64:13.

**11.** *Defendant Rico Sends Plaintiffs Fraudulent Emails In Exchange for Expensive Concert Tickets.*

a. Starting in the fall of 2018, Maza enlisted Defendant Rico to prepare and send fraudulent emails from his Wells Fargo account that were to be sent to Maza's investors to "buy Maza time." **Ex. 24** at 56:17-58:22. In exchange, Maza provided Rico with expensive concert tickets, as well as what is believed to have been cash in envelopes that Maza would hand out to "people that helped him." *Id.* at 47:25-48:11.

b. In particular, Maza would "ask [Herrera] to call Jose [Rico] and have Jose send us an email . . . saying that there was a delay with the wire, that there was . . . problems with the back office, that . . . they were reviewing the wire and it was going to take longer" or whatever "he wanted Jose Rico to say in those emails" and Herrera would "relay the message to Jose, and Jose w[ould] send us the emails." *Id.* at 56:17-57:4. Maza would then "take that email [from Rico] and send it on to the investors" to "buy time for him [Maza] to bring the money" to "pay the investors." *Id.* at 57:15-58:8.

c. Defendant Rico knew that his emails would be forwarded or shown to Plaintiff Jasso. *Id.* at 58:17-22; 160:24-163:8.

d. For example, on October 26, 2018, at the direction of Maza, Defendant Rico sent an email from his Wells Fargo email account to Herrera, explaining that "the policy [for opening up this account] states that any owner/partner who has more than 25% of ownership or control must be present to sign in order for the account to be opened" and that "[i]t [was] highly important if we can get both partners inside the branch as soon as possible to avoid any holds or closures to the account." **Exhibit 111** (Sept. 14, 2021 Lucy Herrera Dep. Ex. 3).

e. On October 26, 2018, at the direction of Maza, Defendant Rico sent an email from his Wells Fargo email account to Herrera that was forwarded to Jasso, explaining that "if all owners/partners are not present, the account Cannot be opened." **Exhibit 112** (JASSO-00002731).

f. On November 28, 2018, per Maza's instructions, Rico sent another fraudulent email from his Wells Fargo email account that was forwarded to Plaintiffs Jasso and Ramirez that falsely represented that a $1.5 million wire had been sent:

> Thank you for your inquiry on the Wire Transfer for $1,500,000.00. The wire was released today and it's currently in transit to the recipients [sic] bank institution. We do not have a specific timeline on the availability of Wires that are sent due to the fact that once they leave the bank they go through the Federal Reserve. But, based off experience the timeline below is somewhat how it works.
> Domestic Wires - 1-5 Business days
> Foreign Wires - 2-7 Business days
> These times are subject to change depending on the receiving bank.

**Exhibit 113** (JASSO-00002729). No $1.5 million wire was sent from the JAMA or FPM accounts in November 2018. **Exhibit 114** (WF-00000161, filed under seal); **Exhibit 115** (WF-00002727, filed under seal); **Exhibit 116** (WF-00002939, filed under seal).

g. On November 28, 2018, per Maza's instructions, Rico sent another fraudulent email from his Wells Fargo email account that was forwarded to Plaintiffs Jasso regarding the $1.5 million wire, falsely stating once again that it was "released last Wednesday November 28, 2018" and was "now at the recipients [sic] bank institution." **Exhibit 117** (JASSO-00002720).

h. On December 5, 2018, Rico had a text exchange with Herrera on his 702-203-6235 personal cell phone and stated the following: "[Rico]: Okay so is it a wire they are expecting as well? [and] is it going to MX? [Herrera]: No, just account is under review and no wires allow to go out at least for another 10 days…." **Exhibit 118** (JASSO-00007094).

i. On December 6, 2018, per Maza's instructions, Defendant Rico sent an email from his Wells Fargo email account that was forwarded to Plaintiff Jasso that falsely claimed that a wire transfer, which was supposed to be sent from the FPM account to fund the transfer of a condominium in Miami, had already been received by the seller's bank. **Exhibit 119** (JASSO-00002718). No such wire was sent from the JAMA or FPM accounts in December 2018. **Exhibit 120** (WF-00000164, filed under seal); **Exhibit 121** (WF-00002733, filed under seal); **Exhibit 122** (WF-00002947, filed under seal).

j. On December 7, 2018, per Maza's instructions, Defendant Rico sent an email from his Wells Fargo email account that was forwarded to Plaintiff Jasso to Herrera an email entitled "Request of Fed Tracking Number" and falsely stated the following:

> Thank you for your recent inquiry.
> The inquiry took a little longer than expected due to high volume of recent inquiries.
> After reviewing this is all the information that I could gather in the past few days.
> Here is a reference number to your wire
> Originating Bank: [redacted]8544
> Originator Reference Number: [redacted]0448
> …
> Wire Transfer Number: [redacted]4891
> Status: Sent 12/03/2018
> Amount: $1,500,000.00
> Wire Type: Outgoing . . . .
> Created on: 12/03/2018 11:53 a.m. PDT….

**Exhibit 123** (JASSO-00002716). No such $1.5 million wire was sent out of the Maza accounts. **Ex. 120**; **Ex. 121**; **Ex. 122**.

k. On December 13, 2018, after Plaintiff Jasso followed up with Maza about a wire transfer meant for Plaintiff Ramirez, per Maza's instructions, Defendant Rico sent an email from his Wells Fargo email account to Plaintiff Jasso and falsely claimed that:

> After doing some research, we have come to the conclusion that Citi bank [sic] is holding the funds and will not give us a time frame for the release of the funds.
> They have given us two options,
> I. Wait and see when the funds could be available.
> 2. Recall the wire Urgently and have the funds available in the morning the next business day (12/13/2018)
> I understand you and your partners are in [sic] a time constraint and the deadline is more than past due.
> Please reach out to me with any questions or concerns to my office.

**Exhibit 124** (JASSO-00002715).

l. On December 13, 2018, after Plaintiff Jasso followed up regarding where in Citibank the wire was being held, Defendant Rico responded from his Wells Fargo email account stating:

> After calling Citi Bank [sic] and speaking to one of their representatives. [sic] They advised us that in order to get any type of information that is on one of their accounts (even through email), the owner or anyone authorized would have to be present. This

is very common in banking due to privacy and account confidentiality. We all strive to keep our customers [sic] information confidential.

**Exhibit 125** (JASSO-00002714).

     m. No such $1.5 million wire was sent from the JAMA or FPM accounts in December 2018. **Ex. 120**; **Ex. 121**; **Ex. 122**.

     n. Maza ordered Herrera to ask Defendant Rico for yet another fraudulent email on January 11, 2019, "saying that after waiting for the check he created a wire from first prime to Mexico in case the funds didn't arrive at Jama" "or something like that[.]" **Exhibit 126** at JASSO-00039692 (Certified Translation of JASSO-00039685). Maza instructed Herrera to offer Defendant Rico concert tickets as an incentive for providing the fraudulent email. *Id.* at JASSO-00039693 (Certified Translation of JASSO-00039685). Herrera complied, and texted Defendant Rico that she "pulled some strings and will be getting you 2 good tickets for Calibash" which was a Latin-music concert. **Exhibit 127** (March 15, 2022 Jose Rico Dep. Ex. 20).

     o. On January 11, 2019, per Maza's instructions, Defendant Rico sent an email from his Wells Fargo email account falsely stating that the wire transfer still had not cleared: "I reached out to my back office on the matter we spoke about and they informed me that the funds of the deposit to the account are going to be processed tonight. The wire we arranged earlier today is good to go and arrive Monday." **Exhibit 128** (March 15, 2022 Jose Rico Dep. Ex. 21, filed under seal).

     p. In fact, such wire never existed and was not sent from the JAMA or FPM accounts in January 2019. **Exhibit 129** (WF-00000168, filed under seal); **Exhibit 130** (WF-00002739, filed under seal); **Exhibit 131** (WF-00002957, filed under seal).

     q. On January 24, 2019, Defendant Rico followed up with Herrera to see if she had "heard anything about the [concert] tickets" promised to him by Maza. In response, Herrera asked Defendant Rico for yet another fraudulent email:

> In need your help!!! I need an email from you . . . Please . . . We were supposed to send a wire out last Tuesday the 23rd and obviously have not done so, we told our client that it shows still pending on our end. Can you send me an email

saying that the hold on the wire will be released today and funds will be available tomorrow!? Wire amount 50K to American Investment Capital.

**Exhibit 133** (March 15, 2022 Jose Rico Dep. Ex. 29).

r. Defendant Rico sent Herrera the requested email that matched her instructions and read: "In regards to your wire for 50k to American Investment Capital, I have reached out to my back office and was told that the funds will be released today and will be available tomorrow." **Exhibit 134** (JASSO-00001755).

s. Defendant Rico's email was false, as no $50,000 wires was sent from any of Maza's accounts on January 24, 2019, or any other date that month. **Exhibit 132** (WF-00000927, filed under seal); **Exhibit 129** (WF-00000168); **Exhibit 130** (WF-00002739); **Exhibit 131** (WF-00002957).

t. Maza described Defendant Rico's participation in his from his Wells Fargo account as scheme as follows: "remember that with Rico.. you have to tell him what to write and he will write it" [and] "tell him to add that the wire will be there Monday". **Ex. 126** at JASSO-00039695-96.

u. On January 17, 2019, per Maza's instructions, Defendant Rico sent an email from his Wells Fargo email account that Rico knew would be sent to Plaintiff Jasso, which falsely stated: "I'm following up on the account status, the account is currently on hold. I am working hard and trying to reach out to my executive offices to see what we can do to get this hold lifted for you. I will continue to work until we can get this matter resolved. If you have any other questions please feel free to reach me." **Exhibit 135** (March 15, 2022 Jose Rico Dep. Ex. 25, filed under seal).

v. This fraudulent email was sent in connection with a $600 cashier's check that Maza had taken out after Plaintiff Jasso requested he provide him with a $600,000.00 cashier's check for the purchase of the Miami condominium, which Rico helped facilitate. **Ex. 3** at 162:1-25.

w. After this case was filed, Defendant Rico no longer worked for Wells Fargo. **Ex. 33** at 137:25-138:1.

12. *Wells Fargo Struggled to Exit the Maza-Related Accounts and Closed them for "Overdrafts."*

a. On February 19, 2019, Plaintiff Jasso stormed into Defendant Darrall's branch and uncovered Maza's fraud after Maza authorized Defendant Darrall to show Maza's FPM account balance. Plaintiff Jasso even informed Darrall that Maza had been defrauding him in a big scene after a lot of yelling. **Ex. 2** at 121-127.

b. Darrall reported this incident to the Transaction Fraud Support Group, her district manager Jeff Wiley and her regional partner, Stacy Allsup. **Exhibit 143** at No. 17 (Excerpt of K. Darrall's Response to Plaintiffs' Second Set of Interrogatories).

c. Wells Fargo did not ███████████████████████████████████████████████████████ **Exhibit 142** (March 16, 2022 E. Sechrist Dep. Ex. 7, filed under seal)

d. On March 15, 2019, after Maza ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." **Exhibit 136** (Oct. 28, 2022 Amy Croke 30(b)(6) Dep. Ex. 16, filed under seal).

e. On March 20, 2019, Diana Stromer from Financial Crimes sent ███████████████████████████████████████████████████████████████████████. **Exhibit 137** (Feb. 23, 2022 R. Villaruel Dep. Ex. 12, filed under seal).

f. Villaruel responded by saying: "████████████████████████████████████████████████████████████. **Exhibit 138** at 103:12-110:18 (Excerpts of Feb. 23, 2022 R. Villaruel Dep. Tr.).

g. On March 20, 2019, Croke forwarded

**Exhibit 139** (March 16, 2022 E. Sechrist Dep. Ex. 1, filed under seal).

On April 15, 2019, a

.

**Exhibit 140** (March 16, 2022 E. Sechrist Dep. Ex. 15, filed under seal).

i. In a follow up email two months later, on May 28, 2019,

**Ex. 70** at 159:7-9 (Excerpts of Oct. 28, 2022 Amy Croke 30(b)(6) Dep. Tr.).

j. Wells Fargo continued to

**Exhibit 141** (March 16, 2022 E. Sechrist Dep. Ex. 6, filed under seal).

k. Over the course of Maza's fraud,

. **Ex. 90** at ¶ 5(c).

l. In order to exit Maza,

. **Ex. 70** at 149:25-150:4.

m.  Despite paying Maza funds from his accounts, Wells Fargo's corporate representative testified that all Maza's accounts were exited "[b]ecause other accounts were overdrawn, and so . . . a decision was made to terminate the entire [Maza] relationship." *Id.* at 149:25-150:14 (Excerpts of Oct. 28, 2022 Amy Croke 30(b)(6) Dep. Tr.).

n.  If the Maza accounts had been ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████ [.]"

*Id.* at 179:14-180:16.

## II.  <u>LEGAL ARGUMENT</u>

Daniel Maza had to search high and low to find a pliant bank that would provide the knowing, substantial assistance necessary to successfully carry out his Ponzi scheme that caused Plaintiffs to lose over $15 million which they reasonably believed were being used to invest in U.S. real estate, but in fact were being used to pay Maza's personal expenses and gambling debts, as well as earlier investors in the scheme. For example, Citibank, Bank of America, and Chase all refused to accept Maza's business and exited the same FPM and JAMA accounts he went on to open at Wells Fargo due to the same (obvious) fraudulent activity. SOF, ¶ A:12.  So, after trying and failing to establish a relationship with most of the other major banking institutions in the country, Maza eventually turned to Wells Fargo, where he should have received the same reception. Yet, Wells Fargo's employees welcomed Maza—and the met quotas and lucrative fees his fraudulent accounts would bring—with open arms.

To be sure, Wells Fargo employed an automated fraud detection system, which was flashing red from the moment Maza walked through the bank's doors. For example, Maza was initially prevented from even opening a checking account at Wells Fargo due to a fraudulent activity report issued by Bank of America, and he was under near-constant investigation at Wells Fargo based on a combination of its own automated fraud alert system, at least one direct report of his fraud by a business branch banker to his supervisor, and four different Financial Crimes department

investigations, and a special inquiry. *Id.* at C. But, over the course of five years, a cadre of Wells Fargo's bankers —including Darrall and Rico—decided to ignore the constant red flags and helped Maza actively ensure that new investor funds continued to flow into his Ponzi scheme.

Plaintiffs assume this Court's familiarity with the applicable analytical framework and legal standards for assessing a motion for summary judgment. *See generally Summers v. McWane, Inc.*, No. 215CV1239JCMGWF, 2019 WL 1117895, at *2 (D. Nev. Mar. 11, 2019) (citing *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000)). And summary judgment is warranted as to each element of Plaintiffs' claim that Wells Fargo aided and abetted Maza's breach of fiduciary duty because there is no genuine dispute that Wells Fargo was not only aware of Maza's fiduciary duty to Plaintiffs, but also knowingly participated in the breach, which caused Plaintiffs over $15 million in damages. *See In re J&J Inv. Litig.*, No. 222CV00529GMNNJK, 2023 WL 2572300, at *6 (D. Nev. Mar. 18, 2023) (citing *In re Amerco Derivative Litig.*, 252 P.3d 681, 701 (Nev. 2011)); SOF ¶ A:2.

"Under Nevada law, to state a claim for aiding and abetting breach of fiduciary duty, a plaintiff must allege the following four elements: (1) that a fiduciary relationship exists; (2) that the fiduciary breached the fiduciary relationship; (3) that the defendant knowingly participated in the breach; and (4) that the breach of the fiduciary relationship resulted in damages."). Further, Nevada's Supreme Court has "adopt[ed] the standard applied by Delaware courts" for this claim, rather than applying the more general standard for civil aiding and abetting. *In re Amerco Deriv. Litig.*, 252 P.3d 681, 702 (Nev. 2011) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)). At the time the Nevada Supreme Court adopted Delaware's standard, it was "well-settled" in Delaware that the element of "knowing participation" could be satisfied not only by actual knowledge, but also by "reckless indifference." *See RBC Cap. Markets, LLC v. Jervis*, 129 A.3d 816, 862 & n.169 (Del. 2015) (quoting *Lord v. Souder*, 748 A.2d 393, 402 (Del. 2000).

**A. There Is No Genuine Dispute Defendants Were Aware of Maza's Fiduciary Duty to Plaintiffs**

There is no genuine dispute that Defendant Wells Fargo—through several of its employees, including its co-Defendants Darrall and Rico—knew that Maza received and handled funds from

investors, including Plaintiffs, which gave rise to a fiduciary duty. For one thing, a fiduciary relationship between an officer and a corporation arises as a matter of Nevada law, and Maza was an officer of FPM and JAMA. *See Munoz v. Wyndham. Hotels & Resorts, Inc.*, No. 221CV01115RFBVCF, 2022 WL 2439798, at *3 (D. Nev. Feb. 10, 2022); *report and recommendation adopted*, No. 221CV01115RFBVCF, 2022 WL 3227641 (D. Nev. June 2, 2022). In addition, under Nevada law, the relationship between an investment advisor (e.g., Maza) and his investors (e.g., Plaintiffs) creates a fiduciary relationship that permits the investors to expect trust and confidence in the integrity and fidelity of their advisor. *See Lopez v. Javier Corral, D.C.*, 367 P.3d 745 (Nev. 2010) (citation omitted); *see Takiguchi v. MRI Int'l, Inc.*, 47 F. Supp. 3d 1100, 1120 (D. Nev. 2014).

At the most basic level, Wells Fargo cannot dispute that it was in possession of the corporate records indicating that Maza was an officer of both FPM and JAMA, establishing Wells Fargo's awareness that Maza had a fiduciary duty to those entities. SOF, ¶¶ B:1, 2; *see Simi Management Corp. v. Bank of America, N.A.*, 930 F. Supp. 2d 1082, 1100 (N.D. Cal. 2013).

But even if Maza were not an officer—and thus a fiduciary—of FPM and JAMA, Wells Fargo was also aware of his fiduciary responsibility to Plaintiffs as their investment advisor. Darrall, for instance, admitted that she understood Maza's business to be "real estate investment" and knew, based on her interactions with Maza and opening accounts for Maza, that Maza took in investor money into the accounts. SOF, ¶¶ B:4-8

Alexander Nelson—who took over as Maza's business banker after Darrall was promoted—was one of several other Wells Fargo employees who, like Darrall, were involved in initiating, handling, and approving wire transfers indicating that Maza was handling investors' money and, in turn, owed them a fiduciary obligation. *Id.* at ¶¶ B:7, B:9. And still other employees in addition to Darrall and Nelson—including Defendant Rico, Darrin Hansen (Maza's first relationship manager), Ursula Gusman (Maza's business associate), and Ilona Mitchell (Maza's second relationship manager)—all testified that they knew that Maza's business was real estate investment, or that he was getting money from investors. *Id.* at ¶¶ B:5, B:10-14. Finally, Jada Burch, a financial crimes associate at Wells

Fargo, also knew that Maza was handling investor money based on her investigation of Maza's account, which revealed numerous checks from Maza's Pente Corp account written to Maza's FPM account for "New Investments," confirmed by her testimony. *Id.* at ¶¶ B:15(b)-(f); C:(3)(e).

**A.   There Is No Genuine Dispute That Defendants Knowingly Participated in Maza's Breach of Fiduciary Duty, Resulting in Damages to Plaintiffs.**

Maza could not carry out an effective real estate investment Ponzi scheme without Wells Fargo's actual knowledge of his breach of fiduciary duty to Plaintiffs and its willingness to knowingly participate in the scheme.  Here, the evidentiary record establishes there is no dispute as to either of these elements.

**1.   <u>Wells Fargo Indiputably Had Actual Knowledge of Maza's Scheme/Breach.</u>**

To begin, "***a bank's decision to ignore suspicious activity or red flags is sufficient to demonstrate actual knowledge***." *In re Woodbridge Invs. Litig.*, No. CV 18-103-DMG (MRWX), 2020 WL 4529739, at *6 (C.D. Cal. Aug. 5, 2020) (emphasis added); *In re First All. Mortg. Co.*, 471 F.3d 977, 999 (9th Cir. 2006) ("That [the bank] came upon red flags which were seemingly ignored was enough to establish actual knowledge under the California aiding and abetting standard ....").  And a bank's actual knowledge is all the more acute when it does not merely consist of automated fraud alerts or unusual transactions that might innocently escape the attention of low-level employees, but where the warning lights are so bright that a bank "employee[] contact[s] a [] group within [the bank] to report the suspicious activity" occurring in an account. *In re J&J Inv. Litig.*, No. 222CV00529GMNNJK, 2023 WL 2572300, at *5 (D. Nev. Mar. 18, 2023).  Moreover, circumstantial evidence, such as facts suggesting the bank's awareness of unusual banking transactions inconsistent with the customer's stated business model also establish actual knowledge. *See, e.g., Simi*, 930 F. Supp. at 1100 (bank's actual knowledge suggested based on suspicious banking activities); *Evans v. ZB, N.A.*, 779 F. App'x 443, 445 (9th Cir. 2019) (it was "plausible" bank had actual knowledge because it knew that its client had "virtually no income" from its stated business).

The undisputed facts demonstrate Wells Fargo's actual knowledge because the record is replete with evidence that it repeatedly decided to ignore Maza's suspicious activity and/or red flags.  For

instance, in June 2014, Wells Fargo initially prohibited Maza from opening any accounts based on "fraudulent activity" reported by Bank of America. SOF, ¶ C:1(d)-(e). By September 2014, however, Darrall, the same Wells Fargo employee who memorialized the Bank of America fraud alert in her handwritten notes, helped Maza open 7 bank accounts at Wells Fargo on the same day, and a fraud analyst cleared the still-present fraud alert, sending Maza off the proverbial Ponzi scheme races. *Id.* at ¶ C:1(f)-(h). Ultimately, with the help of Darrall and other Wells Fargo employees, Wells Fargo allowed Maza to open 30 separate accounts that all shared the same address and many of which were shell companies, which even Wells Fargo considered to be high risk, but conveniently, the bank still assigned them low risk ratings. *Id.* at ¶ C:1(a), (o)-(r).

Meanwhile, Maza's accounts generated a litany of fraud alerts immediately after they were opened, including the surviving Early Warning Services alert which had initially blocked him from opening any accounts, as well the FPM #9109 account that generated six separate fraud alerts within the first five days it was opened from September 15 to 19, 2014. *Id.* at ¶ C:1(i)-(n), n. 7. And, although the FPM account opening documents—which were accessible to Wells Fargo's fraud analysts—revealed that FPM was only supposed to have $150,000 in annual gross sales, $511,758.91 moved in and out of the FPM #9109 account over the course of only 4 days. *Id.* at C:1(j)-(l). As a consequence of Wells Fargo's decision to clear (i.e., ignore) all of these alerts (which all constitute red flags), Maza ultimately used the FPM #9109 account as the main vehicle for his fraudulent activity, funneling $64,687,555.21 into and out of Wells Fargo with little to no real estate purchases, which Wells Fargo indisputably understood to be Maza's "business." *Id.* at ¶¶ B:3-4, C.

In October 2014—at the same time Maza was permitted to open numerous bank accounts for high-risk shell companies that he would use to defraud Plaintiffs—Wells Fargo had deemed Maza to be too much of a credit risk to allow him to obtain an FPM business credit card, even though $940,222.26 had gone into and out of the FPM account from September 14, 2014 to October 9, 2014. *Id.* at ¶ C:1(s). In fact, Wells Fargo also decided disregard this red flag when opening Maza's accounts, as pursuant to its own policies, this past charge-off should have prevented Maza from even opening accounts at Wells Fargo, absent an override – which does not exist. *Id.* at ¶ C:1(t)-(w). In

this regard, Wells Fargo "alter[ed] [its] normal ways of doing business" and "utilize[ed] atypical banking procedures to service [Maza's] accounts," in order to accommodate his fraudulent activity designed to dupe Plaintiffs and his other investors. *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1120 (C.D. Cal. 2003) Wells Fargo's violations of its own policies and procedures further constitutes circumstantial evidence of its actual knowledge of Maza's fraudulent scheme. *Id; see In re First All. Mortg. Co.*, 471 F.3d at 999.

In addition to the automated fraud alerts that put Wells Fargo on direct notice of Maza's fraud scheme, its employees were also sounding the alarm by reporting Maza's suspicious banking activity to their superiors. Nelson admitted at deposition that he reported that Maza's accounts showed signs of "suspicious activity and that he followed the appropriate procedures to report "something suspicious" about Maza's accounts in-person to his branch manager, at least one time and possibly more. *Id.* at ¶ C:2(k). Indeed, over the course of a few days, Nelson had assisted Maza with wiring hundreds of thousands of dollars from the FPM investor account to the Wynn and Cosmopolitan casinos for Maza's gambling marker, despite his knowledge that Maza's business was purportedly for real estate investment. *Id.* at ¶ C:7(b). Of course, Wells Fargo decided to ignore Nelson's direct report(s) of Maza's suspicious activity, and Maza's fraud continued unabated.

In addition to deciding to ignore Nelson, Wells Fargo decided to ignore the flurry of red flags uncovered during four (4) investigations of Maza conducted by the bank's Financial Crimes Investigations department, along with a special inquiry. *Id.* at ¶ C:3. Each of these five (5) investigations involved a financial crimes analyst's review of Maza's (suspicious) transactions, as compared to his stated business of real estate. *Id.* at ¶¶ C:3, B:15(c)-(f). Jada Burch, a financial crimes analyst who investigated Maza twice in April and August of 2017, admitted that Maza's transactions that she reviewed "raised concerns" and contained "red flags." More specifically, Burch admitted that FPM wire transfers for a company that had $150,000 in revenues were "unusual," she couldn't tell if "they're real estate activity or not," and that the "movement of funds" between Pente Corp and FPM was "unusual," and that she would have discussed the "large [Pente] checks, round

dollar amounts and the address [shared between Pente Corp and FPM]" with her manager. *Id.* at ¶ C:3(e).

In addition to the Financial Crimes analysis conducted during five separate Maza investigations, Maza's Wells Fargo bankers were constantly reviewing and ignoring red flags in Maza's fraudulent account activity because they had to check his account balance in order to approve numerous in-branch wire transfers and to prepare emails to Maza directly (on over one hundred occasions) to alert him of potential overdrafts clearing his accounts. *Id.* at ¶ C(4). Importantly, when reviewing a customer's account balance, a Wells Fargo banker could see the last one hundred transactions of a customer's account activity. *Id.* at ¶ C(4)(e).

What both Wells Fargo's financial crimes analysts and its business bankers saw was account activity that met none of the expectations for a real estate investment business – little to no incoming or outgoing payments from law firms and title companies. There would be no need for a bank employee reviewing this account activity to sift through dozens of legitimate real estate transactions in order to find one suspicious transaction. Nearly every transaction from Maza's accounts' opening to their exit was consistent with just one type of enterprise: a fraudulent investment scheme with large, round dollar transactions being moved from one of Maza' Wells Fargo accounts to another, and then wired to Mexico, a high-risk jurisdiction by Wells Fargo's own measure. *Id.* at ¶¶ C:5; C:6. Wells Fargo bankers and financial crimes associates nonetheless decided to ignore the red flags of Maza's account activity – which did not reveal real estate transactions but did reveal that Maza was stealing investor funds from the FPM and JAMA accounts to pay over $3,650,777.55 in charges to his wife's American Express card, which was apparent from the FPM #9083 account's transactions and visible to the bankers. *Id.* at ¶ C:4. Wells Fargo decided to blow by these red flags to keep Maza's scheme running, all while continuously declining him for mortgages and loans while being in possession of his FPM 2014 and 2015 tax returns which themselves revealed the existsence of Maza's Ponzi scheme because they showed FPM was using investor funds to pay off other investors. *Id.* at ¶ C:9.

Finally, it is beyond dispute that Defendant Rico actually knew about Maza's fraud. Rico accepted bribes from Maza to send Plaintiffs numerous fake and fraudulent emails from his Wells Fargo email account about non-existent wire transfers, two of which were sent directly to Plaintiff Jasso. *Id.* at ¶ C:11.

To the extent that Wells Fargo argues that its decision to ignore the barrage of red flags in Maza's accounts alone is not sufficient to demonstrate its actual knowledge that Maza was orchestrating a fraud scheme to defraud Plaintiffs and other investors, its argument would lack merit for two reasons. First, "reckless indifference" can satisfy the actual knowledge prong of aiding and abetting breach of fiduciary duty, *see In re Amerco Deriv. Litig.*, 252 P.3d at 702; *see RBC Cap. Markets*, 129 A.3d at 862 & n.169 (quotations omitted), as could a "defendant's 'conscious avoidance' of knowledge can be enough to satisfy the actual knowledge standard if 'it can almost be said that the defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge.'" *In re Mastro*, No. 09-16841-MLB, 2017 WL 2889659, at *16–17 (Bankr. W.D. Wash. July 6, 2017). Second, as set forth below, by knowingly participating and substantially assisting in the scheme through their affirmative conduct, Wells Fargo, Rico and Darrall demonstrated that they were aware of the scheme in the first place.

Ilona Mitchell, Maza's second relationship manager who was charged with remediating Maza's 29 accounts for money laundering failures under a 2015 OCC Consent Order, admitted that she did not do her job to understand Maza's business – despite meeting with him on at least one occasion (which she conveniently no longer remembers, but her own emails so state). SOF, ¶ 10. Even worse, Mitchell testified that Wells Fargo management instructed her ***not*** to proactively meet with her clients during remediation, which eviscerates the purpose of such remediation – which was at bottom to understand whether Wells Fargo's customers are committing financial crimes and to prevent them from doing so. *Id.* This brazen instruction from Wells Fargo management coupled with Mitchell's abject failure to understand Maza's business is the epitome of both reckless indifference and conscious avoidance. And, when Wells Fargo Financial Crimes once again intervened to investigate Maza in 2019 for a Portfolio Review Inquiry, Wells Fargo had to ask Maza basic KYC questions

such as who his clients were and why he was receiving wires from Mexico – underscoring that Wells Fargo's stratagem was to be recklessly indifferent and consciously avoid its responsibilities to take action in response to the constant red flags present in Maza's accounts. *Id.* at ¶ C. The incredible fact that Maza's fraud ran unfettered during the time when Wells Fargo was required by the federal government to remediate his accounts for money laundering only underscores this point. Make no mistake, Wells Fargo knew about Maza's fraud, and it substantially assisted him in his scheme for five years.

### B. Wells Fargo Knowingly Participated/Substantially Assisted Maza's Breach.

Just as there is no genuine dispute that Wells Fargo was aware of Maza's breach of fiduciary duty to Plaintiffs, there is also no genuine dispute that Wells Fargo knowingly participated in that breach, which resulted in $15 million of damages to Plaintiffs. SOF, ¶ A:2. "'[L]iability may ... be imposed on one who aids and abets the commission of an intentional tort if the person [] knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act[.]'" *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1118 (C.D. Cal. 2003) (quoting *Fiol v. Doellstedt*, 50 Cal.App.4th 1318, 1325–26, 58 Cal.Rptr.2d 308 (1996)). In other words, the evidence in the record establishes that Wells Fargo "knowingly and substantially assisted [Maza] in committing th[e] fraud." *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*, 621 F. Supp. 3d 30, 75 (D.D.C. 2022) (citing *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)).

In Ponzi scheme cases like this one, a bank's knowledge of the breach and knowing participation/substantial assistance in the breach merge. *See In re First All. Mortg. Co.*, 471 F.3d at 995 (quotations omitted). In other words, Wells Fargo demonstrated its knowledge of Maza's scheme to defraud Plaintiffs (at least in part) by actively participating in the fraud and facilitating the misappropriation, commingling of assets, and money laundering necessary to carry it out. Here, Wells Fargo employees demonstrated their knowledge of Maza's fraudulent activity and offered their knowing participation and substantial assistance in several different ways.

"'Ordinary business transactions' a bank performs for a customer can satisfy the substantial assistance element of an aiding and abetting claim if the bank actually knew those transactions were assisting the customer in committing a specific tort." *Id.* Nevada law is in accord. *See CMB Infrastructure Grp. IX LP v. Cobra Energy Investment Finance, Inc.*, 572 F. Supp. 3d 950, 967 (D. Nev. 2021) (the stronger the evidence of knowledge, the less evidence required on substantial assistance, and vice versa). Thus, substantial assistance can be found where the bank "executed the requested banking transactions despite its knowledge that the transactions were assisting [the fraudster] in committing fraud [and breaching fiduciary duty], thus perpetuating the scheme." *In re J&J Inv. Litig.*, No. 222CV00529GMNNJK, 2023 WL 2572300, at \*5 (D. Nev. Mar. 18, 2023); *accord In re First All. Mortg. Co.*, 471 F.3d 977, 995 (9th Cir. 2006) ("[It] was enough to conclude that [the bank] was providing the requisite substantial assistance" by continuing to "satisf[y] all of [the fraudster's] financing needs" and "ke[eping] it in business" despite "its dubious lending practices" and "after other investment banks stopped doing business with [the fraudster]").

The undisputed record evidence demonstrates that Wells Fargo repeatedly accepted deposits from Maza's investors and processed transactions after having actual knowledge or being recklessly indifferent to Maza's fraud, i.e., by deciding to ignore constant red flags and at least one direct report of Maza's suspicious activity and five different Maza Financial Crimes investigations. SOF, ¶¶ B:15; C:1-12. Wells Fargo bankers like Nelson and Defendant Darrall personally facilitated the use of FPM investor funds for Maza's gambling by wiring hundreds of thousands of dollars to casinos for Maza's gambling marker and by vouching for him to the Wynn so that the casino would extend him a line of credit. *Id.* at ¶ C:7. Moreover, Wells Fargo bankers approved wires for Maza's personal expenditures, such as expensive vacation rentals, Formula One race tickets, and to pay his mortgage. *Id.* at C:1(y). And, Wells Fargo bankers like Kennedy and Mitchell facilitated the theft of investor funds by alerting Maza to his wife's American Express card automatic debits to prevent overdrafts in his accounts – that Maza would "cover" by transferring funds from the other FPM or JAMA accounts. *Id.* at C:4. In approving Maza's large, round dollar intra-bank transfer between Pente Corp and FPM, Wells Fargo bankers even performed a forensic tracing of Maza's misappropriation of investor funds that

demonstrated he was stealing investor money and sending it to Hong Kong, a medium-risk jurisdiction. *Id.* at ¶ C:5.

Strikingly, Wells Fargo's substantial assistance did not stop within the four walls of the bank. Rather, Maza bribed Defendant Rico with expensive concert tickets (and possibly cash) to prepare fake and fraudulent emails sent from his Wells Fargo account directly to Plaintiff Jasso, or intended to be forward by Maza to Plaintiffs. *Id.* at ¶ C:11. Maza described Defendant Rico's nefarious participation in his fraudulent scheme as follows: "remember that with Rico.. you have to tell him what to write and he will write it." *Id.* at C:11(5). And write it Defendant Rico did, as he faithfully and substantially assisted Maza in his fraudulent scheme by lying about non-existent wire transfers in emails Maza would order him (via Herrera) to write from his Wells Fargo email account. By way of example, on December 12, 2018, after Plaintiff Jasso followed up with Maza about a wire transfer meant for Plaintiff Ramirez, per Maza's instructions, Defendant Rico sent an email from his Wells Fargo email account to Plaintiff Jasso and falsely claimed that:

> After doing some research, we have come to the conclusion that Citi bank [sic] is holding the funds and will not give us a time frame for the release of the funds.
> They have given us two options,
> I. Wait and see when the funds could be available.
> 2. Recall the wire Urgently and have the funds available in the morning the next business day (12/13/2018)
> I understand you and your partners are in [sic] a time constraint and the deadline is more than past due.
> Please reach out to me with any questions or concerns to my office.

Defendant Rico's email was completely fraudulent; no such $1.5 million wire was ever sent by Maza from the JAMA or FPM accounts. *Id.* at ¶ C:11(k), (m).

Defendant Rico's fraudulent misrepresentations gave Plaintiffs assurances that their investments were safe, which "allowed [Maza] to retain possession of plaintiffs' funds and continue the Ponzi scheme." *Neilson*, 290 F. Supp. 2d at 1131–32. Without this false sense of security provided by Defendants, Maza would not have been able to continue his fraudulent scheme, and such "specific statements [by a bank employee] to [] investors" obviously constitutes "assist[ance to the fraudster] in defrauding investors." *Id.* ("[R]epresentations to various members of the class harmed all plaintiffs because the statements allowed [the fraudster] to retain possession of plaintiffs' funds and continue

the Ponzi scheme."). Defendant Rico's (criminal) substantial assistance in sending fraudulent emails for bribes is fatal to Wells Fargo's argument that it did not knowingly participate in Maza's scheme. In fact, it establishes that Wells Fargo was a direct participant.

Wells Fargo's final act of substantial assistance to Maza's fraud also substantially assisted itself. Specifically, when Wells Fargo finally decided to exit Maza's accounts, it claimed that it did so based on purported "overdrafts," without mentioning the rampant fraud that Maza had engineered with Wells Fargo's direct participation for five years. *Id.* at ¶ C:12(m). In other words, at the same time that Wells Fargo covered up Maza's fraud one final time, it was covering up its own participation as well.

Indeed, when Plaintiff Jasso stormed the branch and reported Maza's fraud to Defendant Darrall on February 19, 2019, Wells Fargo struggled for over four (4) months to close Maza's accounts, despite the fact that Wells Fargo accounts could be closed "at any given time for any given reason." *Id.* at ¶ C:12. The reason for the delay is self-evident: Wells Fargo knew that it had no choice but to exit Maza's accounts due to his blatant fraudulent activity, but required additional time to generate a pretext for closing his accounts that would allow them to avoid drafting an ███████ ███████████████████████—and, by extension, Wells Fargo's own culpable conduct—that would surely serve as a powerful weapon in a lawsuit like this one, and reveal its failure to comply with the OCC Consent Order.

Wells Fargo manager Eileen Sechrist perhaps put it best when she was asked basic KYC questions regarding JAMA. Upon receiving those questions, she sarcastically inquired of the Business Banking Group manager, Vincent Ciminise: "Hmmmmm, Are you surprised?" *Id.* at ¶ C:12(g). Wells Fargo did, in fact, "Know its Customer," Maza, and it knew that he was perpetrating a five-year Ponzi scheme that cost Plaintiffs over $15 million, which came as no surprise to Wells Fargo because its employees played a vital role without which the scheme would not have succeeded.

The reason for this struggle is now apparent: Although Wells Fargo's corporate representative testified that the bank closed Maza's accounts for "overdrafts," in reality (and ironically), it was Wells Fargo who had to pay Maza to make him go away in an attempt to ensure that the bank's actual

knowledge and substantial assistance would go unnoticed by Plaintiffs (and the regulators). *Id.* at ¶ C:12(j)-(n). Instead, the American justice system has allowed the discovery of a mountain of undisputed record evidence establishing that Wells Fargo, Darrall and Rico are each liable as a matter of law for aiding and abetting Maza's breach of fiduciary duty.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant summary judgment in their favor on their Aiding and Abetting Breach of Fiduciary Duty claim.

Dated this 24th day of January, 2024.

SGRO & ROGER

*/s/ Colleen N. Savage*

ANTHONY P. SGRO
COLLEEN N. SAVAGE
**SGRO & ROGER**
2901 El Camino Ave., Suite 204
Las Vegas, Nevada 89102

AND

COURTNEY CAPRIO (*Admitted Pro Hac Vice*)
Florida Bar No. 933961
**KELLY UUSTAL, PLC**
500 N. Federal Highway, Suite 200
Fort Lauderdale, Florida 33301
Telephone: 954-522-6601
cac@kulaw.com

JEFFREY W. GUTCHESS (*Admitted Pro Hac Vice*)
JOANNA NIWOROWSKI (*Admitted Pro Hac Vice*)
AMANDA SUAREZ (*Admitted Pro Hac Vice*)
**AXS LAW GROUP, PLLC**
2121 NW 2nd Avenue, Suite 201
Miami, Florida 33127

*Attorneys for* PLAINTIFFS

## CERTIFICATE OF SERVICE

I certify that I am an employee of Sgro & Roger and that on the 24th day of January, 2024, service of the foregoing PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT was made by mandatory electronic service through the United States District Court's electronic filing system and/or by depositing a true and correct copy in the U.S. Mail, first class postage prepaid, and addressed to the following at their last known address:

| JEFFREY WILLIS<br>RICHARD S. GORDON<br>ERICA J. STUTMAN<br>GREGORY J. MARSHALL<br>JACOB C. JONES<br>**SNELL & WILMER**<br>3883 Howard Hughes Pkwy., Ste. 1100<br>Las Vegas, NV 89169 | Email: JWillis@swlaw.com<br>RGordon@swlaw.com<br>EStutman@swlaw.com<br>GMarshall@swlaw.com<br>JCJones@swlaw.com<br><br>*Attorneys for Defendant*<br>WELLS FARGO BANK, N.A. |
|---|---|
| JEFFREY WILLIS<br>ERICA J. STUTMAN<br>HAYLEY J. CUMMINGS<br>**SNELL & WILMER**<br>3883 Howard Hughes Pkwy., Ste. 1100<br>Las Vegas, NV 89169 | Email: JWillis@swlaw.com<br>EStutman@swlaw.com<br>HCummings@swlaw.com<br><br><br>*Attorneys for Defendant*<br>KATHERINE DARRALL |
| MARK J. CONNOT<br>COLLEEN E. MCCARTY<br>**FOX ROTHSCHILD, LLP**<br>1980 Festival Plaza Drive, Suite 700<br>Las Vegas, NV 89135 | Email: MConnot@foxrothschild.com<br>CMccarty@foxrothschild.com<br><br>*Attorneys for Defendant*<br>JOSE RICO |

_/s/ Alexis Williams_____
Employee of Sgro & Roger