ANTHONY P. SGRO (Nev. Bar No. 3811)
COLLEEN N. SAVAGE (NEV. BAR NO. 14947)
**SGRO & ROGER**
2901 El Camino Ave., Ste. 204
Las Vegas, Nevada 89102
Telephone:  702.384.9800
TSgro@SgroandRoger.com
CSavage@SgroandRoger.com

COURTNEY CAPRIO (*Admitted Pro Hac Vice*)
Florida Bar No. 933961
**KELLY UUSTAL, PLC**
500 N. Federal Highway, Suite 200
Fort Lauderdale, Florida 33301
Telephone: 954-522-6601
cac@kulaw.com
*Attorneys for* PLAINTIFFS

Jeffrey W. Gutchess (*Admitted Pro Hac Vice*)
Florida Bar No. 702641
Joanna Niworowski (*Admitted Pro Hac Vice*)
Florida Bar No. 1031440
Amanda Suarez (*Admitted Pro Hac Vice*)
**AXS LAW GROUP, PLLC**
2121 NW 2nd Avenue, Suite 201
Miami, Florida 33127
Jeff@axslawgroup.com
joanna@axslawgroup.com
amanda@axslawgroup.com

*Attorneys for* PLAINTIFFS

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| ANDREW D. ZARON, solely in his capacity as the Court-Appointed Receiver of JAMA INVESTMENT GROUP, INC., *et al.*, <br><br> Plaintiff(s), <br><br> vs. <br><br> WELLS FARGO BANK, N.A., KATHERINE DARRALL, and JOSE RICO; <br><br> Defendant(s). | Case Number <br> 2:20-CV-00858-CDS-BNW <br><br> **PLAINTIFFS' RESPONSE TO DEFENDANT JOSE RICO'S MOTION FOR SUMMARY JUDGMENT AND STATEMENT OF UNDISPUTED MATERIAL FACTS** |

i

Plaintiffs, Andrew D. Zaron, solely in his capacity as the Court-Appointed Receiver of JAMA Investment Group, Inc., Mauricio Jasso, Guillermo Sesma, Sylvia Martinez Salinas, Belisario Jasso Baldini, Javier Ramirez Lares, Antonio Bachaalani, Rodrigo Fernandez, Juan Romero, and Bernardo Villacecias (collectively, "Plaintiffs"), by and through undersigned counsel, respectfully submit this Response to Defendant Jose Rico's Motion for Summary Judgment ("Rico's Motion") (ECF No. 380) pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56-1 of the District of Nevada Local Rules.

This Response is based upon the following Memorandum of Points and Authorities and Response to Defendant Rico's Statement of Undisputed Material Facts.

Dated this 24th day of January, 2024.

SGRO & ROGER

*/s/ Colleen N. Savage, Esq.*

ANTHONY P. SGRO
COLLEEN N. SAVAGE
**SGRO & ROGER**
2901 El Camino Ave., Ste. 204
Las Vegas, Nevada 89102

AND

COURTNEY CAPRIO (*Admitted Pro Hac Vice*)
Florida Bar No. 933961
**KELLY UUSTAL, PLC**
500 N. Federal Highway, Suite 200
Fort Lauderdale, Florida 33301
Telephone: 954-522-6601
cac@kulaw.com

JEFFREY W. GUTCHESS (*Admitted Pro Hac Vice*)
COURTNEY CAPRIO *(Admitted Pro Hac Vice)*
JOANNA NIWOROWSKI (*Admitted Pro Hac Vice*)
AMANDA SUAREZ (*Admitted Pro Hac Vice*)
**AXS LAW GROUP, PLLC**
2121 NW 2nd Avenue, Suite 201
Miami, Florida 33127

*Attorneys for Plaintiffs*

## MEMORANDUM OF POINTS AND AUTHORITY

I.  **RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56-1, Plaintiffs respond as follows to Defendant Rico's Statement of Undisputed Material Facts ("Statement of Facts"), which correspond to Rico's numbering.

1. Undisputed.

2. Undisputed.

3. Undisputed.

4. Undisputed.

5. Disputed that only two things happened in summer 2018 that would disrupt Maza's fraud and ultimately unravel his scheme. Certain Plaintiffs began inquiring regarding the delay in receiving their payments pursuant to their investor agreements. ECF No. 396-24 at 58:2-8 (Excerpts of Sept. 14, 2021 L. Herrera Dep. Tr.). Disputed that "all of the original investments and reinvestments . . . were complete." Plaintiff Belisario Jasso Baldini contributed $1,500,000.00 to JAMA between August 2018 and February 2019. **Exhibit 1** (Investor Contribution Spreadsheets). Plaintiff Guillermo Sesma Suarez contributed $1,023,744.41 to JAMA and FPM between August 2018 and February 2019. *Id.* Plaintiff Rodrigo Fernandez contributed $1,183,212.42 to JAMA and FPM between August 2018 and February 2019. *Id.* Non-party JAMA investor Hector M. Ibarra Castellano contributed $349,000 to JAMA between August 2018 and February 2019. *Id.*

6. Undisputed.

7. Undisputed, but for completeness, Maza and Herrera with Rico also communicated via telephone and in-person. *See* **Exhibit 2** at 60:5-21 (Excerpts of L. Herrera Dep. Tr.).

8. Disputed—Herrera testified that she did not remember if she fabricated the email, and she further testified that Patricia Guzman, Maza's other assistant, fabricated the majority of the documents on Maza's behalf. *See* ECF No. 380-5 at 206:19-24 ("I don't know. Like I said, I don't remember every single detail of everything."); *see also* **Ex. 2** at 16:1-24 (Excerpts of L. Herrera Dep. Tr.). Guzman admitted to fabricating the screenshots and emails in her testimony. *See, e.g.*, **Exhibit 3** at 95:12-96:3 (Excerpts of P. Guzman Dep. Tr.).

9. Undisputed.

10. Undisputed.

11. Disputed. Wells Fargo did not close all related accounts by March 2019. For example, the JAMA Investment Group Inc. #6813 account stayed open until June 2019 and the First Prime Management Inc. #9109 and #9083 accounts stayed open until July 2019. ECF No. 397-14 at 10, filed under seal.

12. Disputed. Defendant's Statement of Facts does not include the complete quotation from Plaintiffs' Complaint. Paragraph 14 of the Complaint reads: "Without Wells Fargo's opening of Maza's accounts in the first instance, concealment, and facilitation of Maza's fraud, Plaintiffs would not have been defrauded of over $25 million – and would not have 'reinvested' approximately $15 million in 'profits' as a result of their express reliance on Defendants' (mis)representations and legitimization of Maza's scheme." ECF No. 1-1 at 5-6. Disputed to the extent that it limits the damages allegations to allegations contained in Plaintiffs' Complaint. *See id.*

13. Disputed as to the timeframe of Wells Fargo's involvement in Maza's fraudulent scheme, which was from September 2014 until July 2019, when the accounts were finally closed. ECF No. 397-14 at 9-11. Undisputed as to when Defendant Rico got involved with the Maza accounts.

14. Undisputed.

15. Undisputed.

16. Disputed that Plaintiffs had not disclosed the amended amount of damage sought prior to July 5, 2023. Plaintiffs had disclosed these damages in their expert report on January 31, 2023, and provided a corrected computation on June 2, 2023, and amended their Rule 26 disclosures to align with their expert report on June 16, 2023, and then again on July 5, 2023 to correct an error. *See* ECF No. 396-1; **Exhibit 4** (Excerpt of Plaintiffs' Seventh Amended Initial Disclosures). The subsequent amendments to the initial disclosures were to merely correct or to supplement the damages numbers to ensure accuracy. Disputed to the extent that it implies Plaintiffs were required to allocate damages among the Defendants. *See infra* at 22-24.

17. Undisputed that Plaintiffs retained Marcie Bour as their damages expert and that she testified as excerpted in Defendant's Statement of Facts. Disputed that Ms. Bour's report and damages calculation do not apply to Rico or that she failed to opine regarding damages attributable to Rico.

**Exhibit 5** (M. Bour's January 31, 2023 Expert Report, filed under seal); **Exhibit 6** (M. Bour's June 2, 2023 Rebuttal Report, filed under seal); **Exhibit 7** (M. Bour's Decl.); ECF No. 380-12 at 44:8-16. Disputed to the extent that it implies that Ms. Bour was required to opine on causation.

18. Disputed to the extent it implies that Plaintiffs' banking expert, Catherine Ghiglieri, was required to opine on damages. **Exhibit 8** (C. Ghiglieri's January 31, 2023 Expert Report, filed under seal); **Exhibit 9** (C. Ghiglieri's June 1, 2023 Rebuttal Report, filed under seal) **Exhibit 10** (C. Ghiglieri's Decl.).

## II.      PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Aside from the Receiver, Plaintiffs are Mexican nationals. ECF No. 1-1 at 4. In Mexico, the banking system is riddled with corruption, and when making their investments with Maza and depositing them into Wells Fargo, Plaintiffs believed in the legitimacy of the U.S. banking system. *See* **Exhibit 11** at 15:8-11 (Excerpts of S. Martinez Dep. Tr.) ("[T]he most important thing for me was that the money would be received by Wells Fargo . . . that I knew was a prestigious bank."); **Composite Exhibit 12** (Pls.' Decls.).

2. While assisting Maza, Defendant Rico, a Wells Fargo business banker, also held a Series 7 license from FINRA. **Exhibit 13** at 131:11-134:24 (Excerpts of J. Rico Dep. Tr.).

3. Defendant Rico, knew his customer Maza "owned a . . . property investment company" that invested in "[r]eal estate." ECF No. 397-5 at 13:6-23 (Excerpts of March 15, 2022 J. Rico Dep. Tr., filed under seal).

4. All Wells Fargo bankers – including the financial crimes associates and fraud and BSA/AML analysts – had access to the StoreVision Platform, which is a Wells Fargo "customer database that is utilized by the Retail Branch" and "stores client information, [] name, address, phone number, contact information," as well as "ownership" information and "account history[.]" **Exhibit 14** at 174:12-21 (Excerpts of A. Croke Corp. Representative Dep. Tr., filed under seal); **Exhibit 15** at 6:18-22, 16:10-21 (Excerpts of J. Burch Dep. Tr., filed under seal).

5. Accordingly, whenever Rico would review account activity or facilitate a wire transfer for Maza or Herrera, Defendant Rico had access to the last 100 transactions of the JAMA and FPM

accounts via StoreVision Platform, as well as Maza's twenty-seven other Wells Fargo accounts. **Exhibit 16** at 58:22-59:6 (Excerpts of B. Monzon Dep. Tr.).

6. Between August 2018, when Rico first started handling Maza's accounts, and February 2019, when Plaintiff Jasso uncovered Maza's fraud, $4,325,956.83 was invested into JAMA by Plaintiffs, and, between August 2018 and February 2019, $1,413,324.01 was sent between the JAMA and FPM #9109 accounts at Wells Fargo. **Ex.1**; **Exhibit 17** (Transfer Spreadsheets).

7. Defendant Rico cultivated a close relationship with Maza, including by opening up the entire bank branch early with only one other employee to accommodate Maza's investors. **Ex. 2** at 41:7-14 (Excerpts of L. Herrera Dep. Tr.). The two men would hold extended meetings "in Rico's office" where "sometimes [Maza] was there for [] eight hours in the office with Jose Rico at the branch." *Id.*

8. Maza enlisted Rico to prepare and send fraudulent emails from his Wells Fargo account dictated by Maza that were to be sent to Maza's investors (including Plaintiffs) to "buy Maza time." ECF No. 396-24 at 56:17-58:22 (Excerpts of Sept. 14, 2021 L. Herrera Dep. Tr.). In exchange, Maza provided Rico with expensive concert tickets, as well as what is believed to have been cash in envelopes that Maza would frequently hand out to "people that helped him."[1] *Id.* at 47:25-48:11.

9. In particular, Maza would "ask [Herrera] to call Jose [Rico] and have Jose send us an email . . . saying that there was a delay with the wire, that there was . . . problems with the back office, that . . . they were reviewing the wire and it was going to take longer" or whatever "he wanted Jose Rico to say in those emails" and Herrera would "relay the message to Jose, and Jose w[ould] send us the emails." *Id.* at 56:17-57:4. Maza would then "take that email [from Rico] and send it on to the investors" to "buy time for him [Maza] to bring the money" to "pay the investors." *Id.* at 57:15-58:8.

10. Rico knew that his Wells Fargo emails that had been dictated by Maza would be forwarded or shown to Plaintiffs Jasso and JAMA. *Id.* at 58:17-22; 160:24-163:8.

11. For example, on October 26, 2018, at the direction of Maza, Rico sent an email from his Wells Fargo email account to Herrera, explaining that "the policy [for opening up this account] states that

---

[1] Maza would always carry a briefcase filled with $40,000 in cash, and he dispatched Herrera to buy the type of manila envelopes used to put the cash in. **Ex. 2** at 47:1-13 (Excerpts of L. Herrera Dep. Tr.).

any owner/partner who has more than 25% of ownership or control must be present to sign in order for the account to be opened" and that "[i]t [was] highly important if we can get both partners inside the branch as soon as possible to avoid any holds or closures to the account." ECF No. 400-31 (Sept. 14, 2021 Lucy Herrera Dep. Ex. 3).

12. Also on October 26, 2018, at the direction of Maza, Rico sent an email from his Wells Fargo email account to Herrera that was forwarded to Plaintiffs Jasso and JAMA, explaining that "if all owners/partners are not present, the account cannot be opened." ECF No. 400-32 (JASSO-00002731).

13. On November 28, 2018, per Maza's instructions, Rico sent another fraudulent email from his Wells Fargo email account that was forwarded to Plaintiffs Jasso, JAMA, and Ramirez that falsely represented that a $1.5 million wire had been sent:

> Thank you for your inquiry on the Wire Transfer for $1,500,000.00. The wire was released today and it's currently in transit to the recipients [sic] bank institution. We do not have a specific timeline on the availability of Wires that are sent due to the fact that once they leave the bank they go through the Federal Reserve. But, based off experience the timeline below is somewhat how it works.
> Domestic Wires - 1-5 Business days
> Foreign Wires - 2-7 Business days
> These times are subject to change depending on the receiving bank.

ECF No. 400-33 (JASSO-00002729). No $1.5 million wire was sent from the JAMA or FPM accounts in November 2018. ECF No. 400-34 (WF-00000161, filed under seal);  ECF No. 400-35 (WF-00002727, filed under seal);  ECF No. 400-36 (WF-00002939, filed under seal).

14. On December 3, 2018, Plaintiff Jasso copied and pasted Defendant Rico's Wells Fargo email set forth above into a WhatsApp message to Plaintiff Ramirez and wrote:  "As you can see the bank has already confirmed 100% that the money has already left and arrived at the other bank, now it is a matter of the other bank putting it in the correct account, here it says if it was not there today it should be there tomorrow. . . Tomorrow, I will call him to see what is going on but as you can see it is already a bank issue.  It says here very clearly that the money is already in the other bank."  In response to Plaintiff Ramirez's fingers crossed emoji, Plaintiff Jasso wrote: "***You must be kidding man, someone from the bank in the USA would never date to put in writing something that is not***

*true, imagine the trouble they would get into.*" **Exhibit 18** (certified translation of JASSO-00009801) (emphasis added).

15. On November 28, 2018, per Maza's instructions, Rico sent another fraudulent email from his Wells Fargo email account that was forwarded to Plaintiffs Jasso and JAMA regarding the $1.5 million wire, falsely stating once again that it was "released last Wednesday November 28, 2018" and was "now at the recipients [sic] bank institution." ECF No. 400-37 (JASSO-00002720).

16. On December 5, 2018, Rico had a text exchange with Herrera on his 702-203-6235 personal cell phone during which they set up a meeting between Rico and Plaintiff Jasso and, when asked by Rico what Maza needed him to say during the meeting, Herrera stated the following: "[Rico]: Okay so is it a wire they are expecting as well? [and] is it going to MX? [Herrera]: No, just account is under review and no wires allow to go out at least for another 10 days…." ECF No. 400-38 (JASSO-00007094); *see also* **Ex. 2** at 210-12 (Excerpts of L. Herrera Dep. Tr.). The meeting with Plaintiff Jasso, Maza, and Rico occurred on December 6, 2018. Immediately prior to that meeting, Maza met with Rico because Rico "wanted to be briefed as to what Daniel needed him to say or tell Mauricio." **Ex. 2** at 214:19-215:2 (Excerpts of L. Herrera Dep. Tr.); **Exhibit 19** (JASSO-00007128).

17. On December 6, 2018, after the meeting and per Maza's instructions, Rico sent an email from his Wells Fargo email account that was forwarded to Plaintiffs Jasso and JAMA that falsely claimed that a wire transfer, which was supposed to be sent from the FPM account to fund the transfer of a condominium in Miami, had already been received by the seller's bank. ECF No. 400-39 (JASSO-00002718). No such wire was sent from the JAMA or FPM accounts in December 2018. ECF No. 400-40 (WF-00000164, filed under seal);  ECF No. 401-1 (WF-00002733, filed under seal);  ECF No. 401-2 (WF-00002947, filed under seal).

18. On December 7, 2018, per Maza's instructions, Rico sent an email from his Wells Fargo email account that was forwarded to Plaintiffs Jasso and JAMA to Herrera an email entitled "Request of Fed Tracking Number" and falsely stated the following:

> Thank you for your recent inquiry.
> The inquiry took a little longer than expected due to high volume of recent inquiries.
> After reviewing this is all the information that I could gather in the past few days.
> Here is a reference number to your wire
> Originating Bank: [redacted]8544

> Originator Reference Number: [redacted]0448
> …
> Wire Transfer Number: [redacted]4891
> Status: Sent 12/03/2018
> Amount: $1,500,000.00
> Wire Type: Outgoing . . . .
> Created on: 12/03/2018 11:53 a.m. PDT….

ECF No. 401-3 (JASSO-00002716). No such $1.5 million wire was sent out of the Maza accounts.

ECF No. 400-40 (WF-00000164, filed under seal); ECF No. 401-1 (WF-00002733, filed under seal); ECF No. 401-2 (WF-00002947, filed under seal).

19. On December 13, 2018, after Plaintiff Jasso followed up with Maza about a wire transfer meant for Plaintiff Ramirez, per Maza's instructions, Rico sent a false email from his Wells Fargo email account *directly* to Plaintiffs Jasso and JAMA and falsely claimed that:

> After doing some research, we have come to the conclusion that Citi bank [sic] is holding the funds and will not give us a time frame for the release of the funds.
> They have given us two options,
> I. Wait and see when the funds could be available.
> 2. Recall the wire Urgently and have the funds available in the morning the next business day (12/13/2018)
> I understand you and your partners are in [sic] a time constraint and the deadline is more than past due.
> Please reach out to me with any questions or concerns to my office.

ECF No. 401-4 (JASSO-00002715).

20. On December 13, 2018, after Plaintiff Jasso followed up regarding where in Citibank the wire was being held, Rico responded from his Wells Fargo email account *directly* to Plaintiffs Jasso and JAMA, stating:

> After calling Citi Bank [sic] and speaking to one of their representatives. [sic] They advised us that in order to get any type of information that is on one of their accounts (even through email), the owner or anyone authorized would have to be present. This is very common in banking due to privacy and account confidentiality. We all strive to keep our customers [sic] information confidential.

ECF No. 401-5 (JASSO-00002714).

21. No such $1.5 million wire was sent from the JAMA or FPM accounts in December 2018. ECF No. 400-40 (WF-00000164, filed under seal); ECF No. 401-1 (WF-00002733, filed under seal); ECF No. 401-2 (WF-00002947, filed under seal).

22. Maza ordered Herrera to ask Defendant Rico for yet another fraudulent email on January 11, 2019, "saying that after waiting for the check he created a wire from first prime to Mexico in case the

funds didn't arrive at Jama" "or something like that[.]" ECF No. 401-6 at JASSO-00039692 (Certified Translation of JASSO-00039685). Maza instructed Herrera to offer Rico concert tickets as an incentive for providing the fraudulent email. *Id.* at JASSO-00039693 (Certified Translation of JASSO-00039685). Herrera complied, and texted Rico that she "pulled some strings and will be getting you 2 good tickets for Calibash" which was a Latin-music concert. ECF No. 401-7 (March 15, 2022 Jose Rico Dep. Ex. 20).[2] Herrera then passed on Maza's request for another fraudulent Wells Fargo email, telling Rico that she "need[ed] to ask [him] for a huge favor again" and that she "need[ed] an email from [him]" to which Rico responded that he would "call [her] as soon as [he was] done with [his] customer[.]" *Id.* Herrera then informed Defendant Rico of the Wells Fargo email requested by Maza over the phone. *Id.*

23. On January 11, 2019, per Maza's instructions, Rico sent an email from his Wells Fargo email account falsely stating that the wire transfer still had not cleared: "I reached out to my back office on the matter we spoke about and they informed me that the funds of the deposit to the account are going to be processed tonight. The wire we arranged earlier today is good to go and arrive Monday." ECF No. 401-8 (March 15, 2022 Jose Rico Dep. Ex. 21, filed under seal).

24. In fact, such $1.5 million wire never existed and was not sent from the JAMA or FPM accounts in January 2019. ECF No. 401-9 (WF-00000168, filed under seal); ECF No. 401-10 (WF-00002739, filed under seal); ECF No. 401-11 (WF-00002957, filed under seal).

25. On January 17, 2019, Maza, in a desperate attempt to keep Plaintiff Jasso from realizing that Maza had stolen JAMA investor funds and was conducting a Ponzi scheme, dispatched Herrera to go meet with Rico. Herrera reported back to Maza in a text exchange that Rico was "***completely on board***" to craft a fraudulent email to be forwarded to Plaintiffs Jasso and JAMA that the bank "placed holds on the accounts." **Exhibit 20** at JASSO-00008381 (JASSO-00008379) (emphasis added).

26. Herrera also exchanged text messages with Rico asking whether "there [was] a way [he] could place an actual hold on [Maza's] account?" Rico responded that he "used to be able to[] [b]ut not anymore[.]" *Id.* at JASSO-00008382.

---

[2] At his deposition, Defendant Rico admitted that he lied in his interrogatory responses when he described Calibash as a "band." **Ex. 13** at 100:15-101:3 (Excerpts of J. Rico Dep. Tr.).

27. But Rico did follow Maza's instructions by sending a false email from his Wells Fargo email account that same day on January 17, 2019, with the subject line "ACCOUNT RESEARCH" that Rico knew would be (and in fact was) sent to Plaintiffs Jasso and JAMA, which falsely stated: "I'm following up on the account status, the account is currently on hold. I am working hard and trying to reach out to my executive offices to see what we can do to get this hold lifted for you. I will continue to work until we can get this matter resolved. If you have any other questions please feel free to reach me." ECF No. 401-15 (March 15, 2022 Rico Dep. Ex. 25, filed under seal).

28. Plaintiffs believed that the "holds" were legitimate and done at the request of Wells Fargo's legal department due to all of the millions of dollars being invested into FPM by a Chinese real estate fund, which never existed but was part of Maza's scheme. **Exhibit 21** at 117:19-118:11 (Excerpts of JAMA Corp. Rep. Dep. Tr.); **Exhibit 22** at 8-9 (Pl. A. Bachaalani Resps. to Wells Fargo's First Set of Interrogatories) ("Mr. Maza told Mr. Bachalani his Wells Fargo banker, Jose Rico ("Mr. Rico"), had informed Mr. Maza that a payment owed to Mr. Bachalani by FPM could not be completed because the FPM accounts had to be temporarily closed while Wells Fargo's legal department verified the sources of large fund transfers to FPM's accounts."). Maza even went so far as to create fake contracts with the Chinese investors and invite Plaintiff Jasso to dinner with the Chinese investors, who now Plaintiff Jasso understands to have been actors. *Id.*; **Exhibit 23** at 77:14-79:182 (Excerpts of M. Jasso Dep. Tr.); ECF No. 396-7.

29. This particular fraudulent email was sent in connection with Rico and Maza's scheme to make Plaintiff Jasso believe that a $600 cashier's check that Rico assisted Maza in securing was really a $600,000 cashier's check for the purchase of the Miami condominium. ECF No. 396-3 at 162:1-25.

30. On January 17, 2019, Plaintiff Jasso met Maza in Miami Beach, Florida to get hand-delivery of a $600,000 Wells Fargo cashier's check for the purchase of a Miami, Florida condominium with Plaintiff Jasso's "profits" from his JAMA investments and from the business. **Exhibit 24** at 6 (Third Am. Resp. to Wells Fargo Bank, N.A.'s First Set of Interrogs. To Mauricio Jasso); **Ex. 21** at 162:1-166:25 (Excerpts of JAMA Corp. Rep. Dep. Tr.).

31. Maza told Jasso to meet him at the Wells Fargo branch because there was an urgent situation due to Wells Fargo's decision to place a "hold" on the accounts. **Ex. 24** at 6 (Third Am. Resp. to

Wells Fargo Bank, N.A.'s First Set of Interrogs. To Mauricio Jasso); **Ex. 21** at 162:8-25 (Excerpts of JAMA Corp. Rep. Dep. Tr.).

32. While Maza and Plaintiff Jasso stood outside the branch in the parking lot, Rico told Plaintiff Jasso on a call that a cashier's check, which Maza had already ripped up beyond recognition, "had to be destroyed" because "that check couldn't be in any Wells Fargo account, because if they would cash this check, they would put a hold . . . [on] all the accounts of Jama, [and] of First Prime." **Ex. 24** at 6 (Third Am. Resp. to Wells Fargo Bank, N.A.'s First Set of Interrogs. To Mauricio Jasso); **Ex. 21** at 162:8-25 (Excerpts of JAMA Corp. Rep. Dep. Tr.).

33. Based on Rico's prior misrepresentations to Plaintiff Jasso, Jasso believed that a hold was necessary because FPM had so much money going in and going out that the bank's back office and legal department had to examine it. **Ex. 24** at 6 (Third Am. Resp. to Wells Fargo Bank, N.A.'s First Set of Interrogs. To Mauricio Jasso); **Ex. 21** at 162:8-25 (Excerpts of JAMA Corp. Rep. Dep. Tr.).

34. However, the actual cashier's check was issued in the amount of $600—not the $600,000 Plaintiff Jasso believed it to be for based on a picture of the check which Maza had edited to falsify the amount. **Ex. 2** at 243:9-22 (Excerpts of L. Herrera Dep. Tr.).

35. Had Plaintiff Jasso seen the real check, he would have known "that [the photo] was falsified." **Ex. 21** at 162:20-21 (Excerpts of JAMA Corp. Rep. Dep. Tr.).

36. However, because Rico "invented a story so [Jasso] wouldn't realize" the check was falsified, Plaintiff Jasso relied on Rico, believed his explanation as to why the check had to be destroyed, and continued to believe he and the JAMA investors would receive the funds to which they were entitled. *Id.* at 162:22-25.

37. On January 18, 2019, Maza once again dispatched Herrera because he needed yet another "email from Rico saying that [Wells Fargo] closed all three accounts as of yesterday and that they don't want to do business anymore and that they will return the funds to me" in continuation of his attempt to keep Plaintiffs from learning the truth. ECF No. 401-6 at 33 (Certified Translation of JASSO-00039685).

38. Per Maza's instructions, Rico sent the following email on January 18, 2019 that Rico knew was to be forwarded to Plaintiffs Jasso and JAMA: "In regards to accounts we discussed yesterday, the bank has made a business decision to close the accounts." **Exhibit 25** (JASSO-00001753).

39. On January 24, 2019, Rico followed up with Herrera to see if she had "*heard anything about the [concert] tickets*" promised to him by Maza. ECF No. 401-13 (Mar. 15, 2022 Rico Dep. Ex. 29) (emphasis added).

40. After promptly responding that she would send them that same day or the next, less than two hours later Herrera asked Rico for yet another fraudulent email:

> In need your help!!! I need an email from you . . . Please . . . We were supposed to send a wire out last Tuesday the 23rd and obviously have not done so, we told our client that it shows still pending on our end. Can you send me an email saying that the hold on the wire will be released today and funds will be available tomorrow!? Wire amount 50K to American Investment Capital.

*Id.*

41. Less than 1 hour later on that same day (January 24, 2019), Defendant Rico obliged, sending Herrera the requested fraudulent email in exchange for the expensive concert tickets that matched her instructions and read: "In regards to your wire for 50k to American Investment Capital, I have reached out to my back office and was told that the funds will be released today and will be available tomorrow." ECF No. 401-14 (JASSO-00001755).

42. Defendant Rico's email was false, as no $50,000 wire was sent from any of Maza's accounts on January 24, 2019, or any other date that month. ECF No. 401-12 (WF-00000927, filed under seal); ECF No. 401-9 (WF-00000168); ECF No. 401-10 (WF-00002739); ECF No. 401-11 (WF-00002957).

43. The very next day, on January 25, 2019, Herrera informed Defendant Rico that Maza had purchased "great seats" close to the stage for Defendant Rico to the Calibash concert. **Exhibit 26** at JASSO7082-7086 (JASSO-00007082). Herrera promised the tickets would be delivered to Defendant Rico via StubHub, and Rico replied, "Alrighty then" with two smiley face emojis. *Id.*

44. When the tickets did not arrive, Defendant Rico reached out to Herrera the following day, asking if there was "any word on the tickets." **Exhibit 27** at JASSO-00007097 (JASSO-00007097). Apparently, StubHub had technical issues, and the tickets were eventually delivered to Defendant

Rico that afternoon. "Got 'em. Thank you soooo much" was Rico's response. *Id.* Despite knowing that Maza had purchased the tickets on StubHub, Defendant Rico stated in his interrogatory response that the tickets were "comped". *See* **Ex. 13** at 100:6-103:24 (Excerpts of J. Rico Dep. Tr.).

45. Maza purchased Rico's $756.09 concert tickets to the Calibash festival with investor funds from the FPM account. **Exhibit 28** at WF-00002742 (WF-00002739, filed under seal).

46. Maza (accurately) described Defendant Rico's substantial assistance in his fraud as follows: "remember that with Rico.. *you have to tell him what to write and he will write it*" [and] "tell him to add that the wire will be there Monday". ECF No. 401-6 at JASSO-00039695-96 (emphasis added).

47. Brian Monzon, Rico's branch manager, testified that it would be inappropriate to receive envelopes of cash or concert tickets from a customer under Wells Fargo's policies and not report it. **Ex. 16** at 287:14-288:2 (Excerpts of B. Monzon Dep. Tr.) ("Q. But you'd agree with receiving concert tickets and then not reporting it would be inappropriate, right? A. Yes. . . . Q. So you'd certainly agree that if a customer was providing envelopes of cash to one of your bankers, that would be completely inappropriate, right? A. Of course.").

48. In 2019, Plaintiff Jasso and Herrera made a referral to the FBI in Miami, Florida regarding Maza's fraud and Rico's acceptance of bribes. **Ex. 23** at 173:17-174:7 (Excerpts of M. Jasso Dep. Tr.); **Ex. 2** at 9:4-16 (Excerpts of L. Herrera Dep. Tr.) ("Have you spoken to the FBI about your relationship with Daniel Maza? A. Yes.").

49. In July 2020, two months after this case was filed, in the middle of the pandemic, Defendant Rico resigned from Wells Fargo without another job lined up, and he testified that as a result of his resignation, he no longer had health insurance for his four young children. **Ex. 13** at 137:25-139:2, 150:3-10 (Excerpts of J. Rico Dep. Tr.). Defendant Rico went on to work at Amazon and the CVS call center. *Id.*

## III.    ARGUMENT

A traditional Ponzi scheme—like the real estate investment Ponzi scheme at the core of this case—consists of a fraudulent or nonexistent investment opportunity in which "early investors are paid off with money put up by later ones." *Ponzi Scheme,* MERRIAM-WEBSTER (online ed.), at https://tinyurl.com/4c9n6nt8 (last updated Aug. 6, 2023). Inevitably, those later investors begin

asking the fraudster when their investments will be paid off. And because there is no genuine investment opportunity to provide a legitimate source of funds, the fraudster is left with no choice other than to buy additional time to dupe even more victims and keep the scheme afloat. When Maza was faced with that dilemma and his Ponzi scheme was at risk of crumbling, Defendant Wells Fargo and its Series-7 licensed business banker, Defendant Rico, provided a critical lifeline to the detriment of Plaintiffs and Maza's other victims. *See* Pls.' Statement of Undisputed Material Facts ("SOF") at ¶¶ 2-3, 6-46. Rather than provide Plaintiffs truthful answers about the status of their investments, Rico followed Maza's orders to lie to them. In emails he drafted and sent from his Wells Fargo email address – which lent the legitimacy of an American industry-leader bank to Mexican nationals who trusted the American banking system – Rico conveyed false assurances that the investors had no cause for alarm and their funds were subject to "ordinary" banking delays. *See* SOF at ¶¶ 7-46. Rico's knowing and substantial assistance allowed Maza to prolong the lifespan of his Ponzi scheme, resulting in millions of dollars of damages to Plaintiffs and other investors.

A. **Defendant Rico Aided and Abetted Maza's Ponzi Scheme by Knowingly Participating in It, Precluding Summary Judgment on the Third Cause of Action.**

Rico actively participated in Maza's Ponzi scheme and is culpable for aiding and abetting Maza's breach of fiduciary duty to his investors, including Plaintiffs. In fact, Rico correctly agrees that the central question in his case boils down to whether he "knowingly participated" in Maza's breach of fiduciary duty, though he mistakenly construes the disputed facts in the record in the light most favorable to himself, rather than Plaintiffs, in urging the Court to enter summary judgment in his favor. ECF No. 380 at 17-18. By following Maza's instructions to affirmatively mislead Plaintiffs (***both in fraudulent Wells Fargo emails and verbally)*** about the status of their investments and the reasons that their expected returns were delayed, *see* SOF at ¶¶ 7-46, there is (at least) a genuine dispute of fact as to whether Rico knowingly participated in Maza's breach of fiduciary duty to Plaintiffs, as even the cases cited in Rico's motion underscore. *See, e.g.*, *In re Amerco Deriv. Litig.*, 252 P.3d 681, 702 (Nev. 2011) (cited at ECF No. 380 at 18) ("[Plaintiffs'] claim for aiding and abetting [a] breach of . . . fiduciary duty . . . was improperly dismissed" given the allegation that defendants "knowingly participated in the breach[ ]").

For example, in November 2018, Plaintiffs Jasso and Ramirez asked about the status of an expected $1.5 million wire transfer that Maza should have sent – but for the fact that those funds had already been misappropriated and used to pay off earlier investors in his Ponzi scheme and Maza's exorbitant personal expenses. Because Maza knew that admitting the true status of the wire transfer would alert Plaintiffs to a problem that would imperil his Ponzi scheme, he implored Rico to help "buy [him] time" and avoid the suspicion of his investors. SOF at ¶ 7; ECF No. 396-24. Rather than report Maza's fraud or at least decline to facilitate it, Rico instead elected to follow Maza's orders by sending a fraudulent email from his Wells Fargo email account (which was later forwarded to Plaintiffs Jasso and Ramirez), and misrepresented to the investors that "[t]he wire was released today" and was "currently in transit":

> Thank you for your inquiry on the Wire Transfer for $1,500,000.00. The wire was released today and it's currently in transit to the recipients [sic] bank institution. We do not have a specific timeline on the availability of Wires that are sent due to the fact that once they leave the bank they go through the Federal Reserve. But, based off experience the timeline below is somewhat how it works.
>
> Domestic Wires – 1-5 Business days
> Foreign Wires – 2-7 Business days
> These times are subject to change depending on the receiving bank.

ECF No. 400-33 (JASSO-00002729); SOF at ¶ 12. Rico's emails – as always – had their desired effect because Plaintiffs, who are Mexicans used to corruption and fraud in their country's banking system, believed in the legitimacy of the United States banking system. Plaintiff Jasso forwarded Rico's email to Plaintiff Ramirez, explaining that "the bank has already confirmed 100% that the money has already left and arrived at the other bank," and in response to Plaintiff Ramirez's fingers crossed emoji, Jasso wrote: "***You must be kidding man, someone from the bank in the USA would never dare to put in writing something that is not true, imagine the trouble they would get into***." SOF at ¶ 13 (emphasis added). Contrary to Defendant Rico's fraudulent email and Plaintiff Jasso's reliance, however, it is undisputed that no $1.5 million wire was sent from the JAMA or FPM accounts in November 2018. ECF No. 400-34 (WF-00000161, filed under seal); ECF No. 400-35 (WF-00002727, filed under seal); ECF No. 400-36 (WF-00002939, filed under seal); SOF at ¶¶ 12, 14.

Rico refuses to grapple with the evidence in the record illustrating that he actively and knowingly participated in Maza's breach of fiduciary duty and, worse, did so as a matter of course. For instance, although Rico weakly alleges that "**some** communications attributed to [him] were actually fabricated by [his] assistant, Lucy Herrera," ECF No. 380 at 18, even that sliver of an argument is a matter of factual dispute. *See* Pls.' Resp. to Defendant Rico's SOF at ¶ 8. But, more to the point, Rico does—and cannot—dispute that **most** communications attributed to him are supported by the great weight of the evidence showing that Herrera faithfully conveyed Maza's instructions, which Rico followed, to prepare false email messages from a Wells Fargo account falsely stating that "there was a delay with the wire" or "problems with the back office," in order to "buy time for [Maza]" to temporarily mollify his duped investors (Plaintiffs) and extend his Ponzi scheme. SOF at ¶ 7; ECF No. 396-24.

Similarly, Rico attempts to argue that he merely engaged in "ordinary communications regarding a customer's account," but that argument is unsustainable. ECF No. 380 at 18. After all, there is nothing "ordinary" about a bank employee acting as a conduit to launder misrepresentations to stave off Ponzi scheme investors, as Rico did by allowing Maza to dictate "whatever he wanted [Rico] to say in . . . emails" designed to fraudulently deflect investors' questions about the status of their funds. SOF at ¶ 7; ECF No. 396-24. Nor would any reasonable juror—much less *every* reasonable juror—agree with Rico that it is "ordinary" for a sophisticated business banker with a Series 7 license to run afoul of federal law and Wells Fargo's ethics policies by accepting bribes in exchange for signing his name to such knowingly fraudulent emails. *See* 18 U.S.C. § 215(a)(2) (imposing criminal sanctions for any "employee of a financial institution" who "corruptly solicits or demands for the benefit of any person, or corruptly accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business or transaction of such institution"); **Exhibit 29** (2016 and 2017 Wells Fargo's Code of Ethics & Business Conduct). In fact, Defendant Rico's communications were so far from "ordinary" that the Wells Fargo branch manager responsible for supervising Defendant Rico was forced to admit under oath in a deposition that his conduct, if proven, would have been "inappropriate." SOF at 47 (Excerpts of B. Monzon Dep. Tr.) ("Q. But you'd agree with receiving concert tickets and then not reporting it would

be inappropriate, right? A. Yes. . . . Q. So you'd certainly agree that if a customer was providing envelopes of cash to one of your bankers, that would be completely inappropriate, right? A. Of course.").

Finally, there is no merit to Rico's argument that he is entitled to summary judgment because he supposedly did not "knowingly" participate in Maza's breach. ECF No. 380 at 12. But, as Rico correctly notes, "Nevada has adopted the standard applied by Delaware courts" requiring proof that he "'knowingly participated'" in Maza's breach. *Id*. (quoting *In re Amerco*, 252 P.3d at 702). And, when the Nevada Supreme Court adopted that legal standard, it was well settled in Delaware that the element of "knowing participation" could be satisfied not only by actual knowledge, but also by "reckless indifference." *See RBC Cap. Markets v. Jervis*, 129 A.3d at 862 & n.169 (Del. 2015) (quoting *Lord v. Souder*, 748 A.2d 393, 402 (Del. 2000) ("It is well-settled under both Delaware law and the law of most other jurisdictions that the scienter element can be satisfied by a showing of recklessness")).

In short, there is plenty of direct and circumstantial evidence in the record to support a factfinder's determination that Rico's fraudulent verbal and written communications – preceded by text messages "***tel[ing]l him what to write and he will write it***" – reflected his actual knowledge that he was actively participating in Maza's scheme. SOF at ¶ 45. But, even if it were possible to drum up any doubt about Rico's actual knowledge, summary judgment would be particularly inappropriate given that his "reckless indifference" or "'conscious avoidance' of knowledge" that he was participating in Maza's breach of fiduciary duty would be a sufficient predicate for liability under Nevada law. *See id.*; *see also In re Mastro*, No. 09-16841-MLB, 2017 WL 2889659, at *16–17 (Bankr. W.D. Wash. July 6, 2017) ("[D]efendant's 'conscious avoidance' of knowledge can be enough to satisfy the actual knowledge standard if 'it can almost be said that the defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge'"). Tellingly, Rico does not – because he cannot – dispute that he sent Plaintiffs fraudulent emails from his Wells Fargo account at Maza's behest in exchange for bribes, which a reasonable jury could determine was conduct engaged in (at a minimum) with

reckless indifference to the rights of Plaintiffs, warranting a denial of Rico's Motion on this cause of action.

**B. Defendant Rico Conspired with Maza, Precluding Summary Judgment on the Seventh Cause of Action.**

For essentially the same reasons that Rico is liable for aiding and abetting Maza's breach of fiduciary duty, Rico is also liable for conspiring with Maza to commit the breach. *See In re Mastro*, 2017 WL 2889659 at *19 (denying motions for summary judgment and observing that a "claim for civil conspiracy . . . overlaps substantially with [a] claim for aiding and abetting," with the "prime distinction between civil conspiracies and aiding-abetting [being] that a conspiracy involves an agreement to participate in a wrongful activity."). In fact, Rico does not even substantively dispute Plaintiffs' conspiracy claim, but rather merely asserts that there is supposedly "no substantially probative evidence he conspired with Maza." ECF No. 380. By neglecting to support this glancing, conclusory statement without conducting any factual analysis or citing any legal authority, Rico has forfeited his request for summary judgment which must be supported by citations to the factual record and a cogent legal analysis. Fed. R. Civ. P. 56.

Moreover, even if Rico had properly advanced this argument, it would have been unsupportable in any event. For instance, rather than address the core conspiracy between ***Rico and Maza*** that is actually alleged in the Complaint, ECF No. 1-1 at ¶¶ 209-18, Rico instead attempts to embark on a distracting frolic as to whether the intracorporate conspiracy doctrine would preclude Plaintiffs from alleging and proving the existence of a conspiracy between ***Rico and Wells Fargo*** – which is not at issue here.  ECF No. 380 at 12-14; ECF No. 1-1 at ¶¶ 209-18. Of course, only Rico was an employee of the bank, and Maza was not, meaning that the intracorporate conspiracy has no role to play in determining whether an actionable conspiracy was formed between Rico and Maza. *See In re JUUL Labs, Inc., Mktg. Sales Prac. & Prod. Liab. Litig.*, No. 19-MD-02913-WHO, 2021 WL 3112460, at *19 (N.D. Cal. July 22, 2021) ("The 'intra-corporate conspiracy' doctrine does not bar the allegations against the Founder Defendants because the conspiracy alleged is broader than one simply between the [defendants] Founders and JLI.").

Even if Plaintiffs had only alleged the existence of a conspiracy between Rico and Wells Fargo—as opposed to the conspiracy between Rico and Maza which they actually alleged—Rico's analysis of the intracorporate conspiracy doctrine would still be erroneous. In the counterfactual hypothetical case that Rico proposes, the intracorporate conspiracy doctrine still would not apply because it is subject to an exception in cases like this one, where the facts demonstrate that the employee (Rico) "possesse[d] a personal stake" in the objective of the conspiracy that was "sufficient[ly] separate and distinct from" the interests of the employer (Wells Fargo). *See In re JUUL Labs*, 2021 WL 3112460 at *19 ("[P]laintiffs have adequately alleged that the Defendants' personal stake in the result of their fraudulent acts are sufficient separate and distinct" to constitute an exception to the intracorporate conspiracy doctrine). Though Rico claims that his interest in the conspiracy comprised "such a nominal benefit" that recognizing the exception in his case would render the doctrine "meaningless," his opinion is misguided. ECF No. 380 at 20. To the contrary, whether Rico received a benefit—and whether it constituted a sufficient personal stake to overcome the intracorporate conspiracy doctrine—would constitute quintessential fact questions to be resolved by the jury. *See, e.g.*, *Leung v. Town of Oyster Bay*, No. 216CV4356ADSAYS, 2019 WL 5309995, at *11 (E.D.N.Y. Oct. 21, 2019) (denying motion for summary judgment where "the parties' submissions raise genuine disputes as to whether the case fits within the personal stake exception" including "questions of fact as to the Defendants' motives"). And, even if any legal authority supported Rico's policy-based And here, the personal bribes that Rico received from Maza in connection with his role in effectuating the Ponzi scheme—including expensive concert tickets conveyed as an "incentive" to send an email containing false information—were not nominal because they constitute sufficient consideration to trigger criminal liability under 18 U.S.C. § 215(a)(2) and demonstrate that Rico had personal interests in stake in furthering of Maza's Ponzi scheme, separate and apart from the job-related compensation that Rico received from Wells Fargo. SOF at ¶¶ 21, 38, 42-44.

In sum, the intracorporate conspiracy doctrine does not apply to the conspiracy between Rico and Maza and the first instance, and it would be subject to the personal-stake exception in any event. Accordingly, nothing remains of Defendant Rico's summary judgment argument that is sufficient to

withstand the avalanche of probative evidence supporting Plaintiffs' allegation that he "actively conspired with Maza." ECF No. 1-1 at ¶ 210; *AccuImage Diagnostics Corp v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 952 (N.D. Cal. 2003) ("[P]articipation in a civil conspiracy can be inferred from circumstantial evidence of defendant's conduct. . . . . An alleged conspirator's 'requisite concurrence and knowledge may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances'").

And the evidentiary record here demonstrates that Defendant Rico cultivated such a close relationship with Maza, including by opening up the entire bank branch early with only one other employee to accommodate Maza's investors. SOF at ¶ 7. Likewise, the two men would hold extended meetings "in Rico's office" where "sometimes [Maza] was there for [] eight hours in the office with Jose Rico at the branch." *Id.* And, the overall circumstances of Rico's unorthodox conduct when taken together as a whole—including Rico's willingness to parrot knowingly false emails from his Wells Fargo account dictated by Maza to mislead investors—is indicative of his agreement to participate in the underlying conspiracy. *See* SOF at ¶¶ 7-46; *accord Bernal v. Beard*, No. 2:16-CV-2511 AC P, 2021 WL 1238248, at *7 (E.D. Cal. Apr. 2, 2021), *report and recommendation adopted*, No. 216CV2511JAMACP, 2021 WL 2652106 (E.D. Cal. June 28, 2021) ("[T]he existence of a conspiracy is a factual question suitable for resolution by a jury.").

**C. Defendant Rico Was Negligent by Violating His Duty to Be Truthful After Electing to Speak and Had a Special Relationship, Precluding Summary Judgment on Count II.**

The evidence in the record also supports Plaintiffs' claim that Rico was negligent in misleading investors in order to buy Maza more time to perpetuate his Ponzi scheme. Although Rico asserts that he is entitled to summary judgment because he supposedly did not "owe any duty to third parties such as Plaintiffs," he is incorrect as a matter of law. ECF No. 380 at 16. To the contrary, Rico chose to "respond[ ] to an inquiry" by the investors about the status of their funds that Rico knew had been misappropriated in Maza's Ponzi scheme, and thus assumed—and violated—a legal "duty to impart correct information" in response to the inquiry. *Nevada Nat. Bank v. Gold Star Meat Co.*, 89 Nev. 427, 430, 514 P.2d 651, 653–54 (1973).

While Rico is partially correct in observing that he "was originally under no duty to divulge any information" to Plaintiffs, he was "required to exercise due care" after "voluntarily ventur[ing]" to provide them with information. *Id.* at 654. As the Nevada Supreme Court explained—and as other courts have echoed—Rico "assumed [a] duty" of care when he chose to respond to investors' inquiry and then "breached it by failing to state accurately and with full candor the" status of wire transfers and the Maza bank accounts:

> Where a bank office through its officer undertakes to give advice, even gratuitously, that officer is bound to use the skill and expertise which he has or which he could be presumed to have. When that officer negligently or carelessly attempts to discharge that duty by misrepresenting facts within his knowledge, the bank should be held responsible for those misrepresentations.

*Id.; accord Bank of Nevada v. Butler Aviation-O'Hare, Inc.*, 96 Nev. 763, 765 (1980) (affirming judgment against the bank where "[t]he record amply support[ed] a finding that at least one officer, Ron Foglia, negligently misrepresented the facts regarding the customer's account balances to the respondents' credit manager, and that the credit manager reasonably relied upon the information he was given."); *Lombino v. Bank of Am., N.A.*, 797 F. Supp. 2d 1078, 1082 (D. Nev. 2011) ("[Plaintiff, the bank's customer,] introduced evidence that he authorized the wire transfer after [the bank's branch manager] misrepresented that the check had cleared. . . . As Defendants apparently concede, such testimony is sufficient to establish a 'prima facie case' of negligent misrepresentation").

The undisputed evidentiary record is replete with instances in which Rico negligently failed to discharge his duty to refrain from providing knowingly false information to Plaintiffs, including in December 2018, when Plaintiff Jasso asked Maza about the status of a wire transfer intended for Plaintiff Ramirez. Maza, in turn, directed Rico to mislead Plaintiffs. SOF at ¶¶ 16-21. And Rico complied with Maza's directive by sending emails to Plaintiff Jasso to make affirmative misrepresentations that the funds were in transit and other falsehoods intended to stall Plaintiffs from engaging in any further follow-up:

> After doing some research, we have come to the conclusion that Citi bank [sic] is holding the funds and will not give us a time frame for the release of the funds.
> They have given us two options,
> I. Wait and see when the funds could be available.
> 2. Recall the wire Urgently and have the funds available in the morning the next business day (12/13/2018)

> I understand you and your partners are in [sic] a time constraint and the deadline is more than past due.
> Please reach out to me with any questions or concerns to my office.

ECF No. 401-4 (JASSO-00002715); *accord* ECF No. 401-5 (JASSO-00002714) (Rico **directly** misrepresenting to Plaintiffs Jasso and JAMA that, "[a]fter calling Citi Bank [sic] and speaking to one of their representatives," "[t]hey advised us that in order to get any type of information that is on one of their accounts (even through email), the owner or anyone authorized would have to be present. This is very common in banking due to privacy and account confidentiality. We all strive to keep our customers [sic] information confidential."). In fact, no such $1.5 million wire was sent from the JAMA or FPM accounts in December 2018. SOF at ¶ 21.

In short, Rico's involvement was particularly crucial to the success of Maza's fraud scheme because investors—and especially foreign nationals like the individual Plaintiffs in this case—are especially prone to rely on the (mis)representations offered by a representative of an industry-leading American banking institution. *See Bank of Nevada*, 96 Nev. 763, 765, 616 P.2d 398, 399 (1980) ("'The position of an agent'" of a bank "'facilitates the reliance of third persons to whom such information appears accurate and to whom such agent appears to be acting in the ordinary course of the business entrusted to him.'") (quoting *Nevada Nat'l Bank*, 89 Nev. at 427). For example, Plaintiff Jasso, a Mexican national, had little reason to doubt Defendant Rico when he covered for Maza by lying that a $600,000 check supposedly "had to be destroyed" in order to avoid triggering an investigation based on the large sums of money being exchanged in the FPM account that would risk "put[ting] a hold [on] the accounts of JAMA [and] of First Prime." SOF at ¶¶ 30-33. In fact, Maza had falsified a photo of the cashier's check, which was actually only in the amount of $600—and not the $600,000 that Maza had claimed," and so Defendant Rico had to "invent[ ] a story" to explain its destruction to prevent Jasso from "realiz[ing] that [the photo] was falsified." SOF at ¶¶ 34-36. As a direct result of this fabrication and several others conveyed by Rico—which were often predictably passed as messages among the various Plaintiffs—Plaintiffs were thrown off the trail of suspicion and continued to mistakenly believe that Maza would eventually provide the funds that he owed them. SOF at ¶ 36.

Furthermore, Rico also had a duty to disclose based on the "implied fiduciary relationship [that] ha[d] arisen based on [Rico's] superior knowledge which [Plaintiffs] could not have discovered without disclosure by [Rico]." *Regions Bank v. Kaplan*, No. 8:12-CV-1837-T-17MAP, 2016 WL 1592748, at *13–14 (M.D. Fla. Apr. 18, 2016), *order clarified*, No. 8:12-CV-1837-T-17MAP, 2016 WL 11121389 (M.D. Fla. Apr. 29, 2016). Rico, who (unlike Plaintiffs) had access to the account activity occurring in all of Maza's twenty-nine accounts, held a position of superior knowledge regarding Maza's accounts and banking relationship, and Plaintiffs "impose[ed] confidence in the [Defendant Rico] because of [his] position, and the [Defendant] kn[e]w[] of this confidence" when Plaintiffs inquired about the status of Maza's accounts on numerous occasions. *Mackintosh v. Jack Matthews & Co.*, 109 Nev. 628, 634–35 (1993) ("Nondisclosure will become the equivalent of fraudulent concealment when it becomes the duty of a person to speak in order that the party with whom he is dealing may be placed on an equal footing with him. The duty to speak does not necessarily depend on the existence of a fiduciary relationship. It may arise in any situation where one party imposes confidence in the other because of that person's position, and the other party knows of this confidence." (internal citations omitted)). Because of his position and knowledge, Rico knew of the true status of Maza's accounts, which did not contain any legitimate real estate investment business activity, but rather exhibited a pattern of fraud. The factual record "is sufficient to support a duty to disclose under the facts of this case"—a duty which Rico breached when he failed to provide true information regarding Maza's accounts to Plaintiffs. *See Regions Bank*, 2016 WL 1592748 at *14 ("The Court finds that the alleged fraudulent scheme, including knowingly presenting SAA checks issued on insufficient funds, and manipulation of the check collection process, is sufficient to support a duty to disclose under the facts of this case."). Therefore, Rico's Motion must be denied as a jury is entitled to decide Plaintiffs' claim for negligent misrepresentation.

**D.** **Plaintiffs' Claim for Damages Is Fully Supported**.

In addition to failing to establish any viable grounds for entering summary judgment on any of Plaintiffs' substantive claims, Defendant Rico bookends his motion for summary judgment with two equally meritless arguments attacking Plaintiffs' claims for damages. There is no authority for Rico's argument that summary judgment can be granted on liability based on any alleged failure to

apportion damages in Rule 26 disclosures; rather, in cases like this that involve conspiracy and intentional torts, the jury must calculate damages.

### 1. **The Jury Is Entitled to Calculate Damages.**

Plaintiffs exhaustively computed and substantiated their claim for damages against Rico, not only through discovery, including their initial disclosures, but also in a detailed expert report. Even Rico acknowledges that Plaintiffs supplemented their initial disclosures at least eight times as they discovered additional facts and were able to calculate their damages with greater precision. ECF No. 380 at 14-15. Then, on January 31, 2023, Plaintiffs provided all defendants with an expert report on damages, explaining the calculations and analysis done to calculate the damages at issue, before refining some of those calculations in their June 2, 2023 rebuttal expert report on damages. Pls.' Resp. to Defendant Rico's SOF at ¶ 16. In light of all of these materials, which were appropriately disclosed and supplemented throughout the litigation, Rico cannot argue that he has been deprived of the requisite notice of the damages sought by Plaintiffs or an opportunity to challenge them.

Against this backdrop, Rico is wrong to argue that Plaintiffs had any additional obligations to provide any more specific computations or calculations, including any additional obligation to distinguish the damages applicable to individual claims or parties. ECF No. 380 at 14-15. To the contrary, the apportionment of damages in a case involving intentional misconduct and conspiracy is a question for the jury to decide. *See Atlas Flooring, LLC v. Porcelanite S.A. DE C.V.*, 425 F. App'x 629, 633 (9th Cir. 2011) ("The jury allocated the total amount of damages to the different theories" including fraudulent misrepresentation claim). And that is particularly true in a case like this one, where Plaintiffs' claims are pled in the alternative and ultimately caused the same damages, for which all Defendants could be jointly and severally liable based on their conspiratorial and intentional tortious misconduct. Nevada law provides for "joint and several liability . . . of defendants in an action based upon: . . . [a]n intentional tort . . . [or] [t]he concerted acts of the defendants." Nev. Rev. Stat. § 41.141(5). And the complaint in this case asserts several intentional torts based on concerted acts that are accordingly susceptible to a joint-and-several award of damages. *See* ECF No. 1-1 at 28-40 (causes of action for negligent and fraudulent misrepresentation, civil conspiracy, fraudulent concealment and inducement, and aiding and abetting breach of fiduciary duty). Consequently,

"under Nevada law, Plaintiff[s] may hold co-conspirators jointly and severally liable for damages," and thus "Plaintiff[s] can choose to seek full payment of her damage awards from either" or all Defendants in this matter. *Ivey v. Spilotro*, No. 2:11-CV-02044-RCJ, 2012 WL 2788980, at *4 (D. Nev. July 9, 2012).

Indeed, even if Defendants were to only be found liable under a negligence theory and thus only severally liable to Plaintiffs under the comparative negligence statute, or under both an intentional tort and negligence theory, it would be for "the jury [to] determine[] . . . the percentage of negligence attributable to each party remaining in the action." Nev. Rev. Stat. § 41.141(2)(b)(2); *see Cafe Moda v. Palma*, 128 Nev. 78, 84 (2012) ("Because the jury found Café Moda to be 20% at fault, it is to be held severally liable for 20% of Palma's damages [under a negligence theory of liability]. And because our construction of the statute leaves subsection 5 unchanged, Richards remains jointly and severally liable for 100% of Palma's damages [under an intentional-tort theory of liability]"); *see also ETT, Inc. v. Delegado*, 126 Nev. 709, 367 P.3d 767 (2010) (finding that where "there was no evidence to suggest that Rosa was negligent, her contributory negligence was not a viable defense" and thus "NRS 41.141 [was] not implicated and ETT was properly found jointly and severally liable").

Moreover, Plaintiffs are entitled to seek to recover for their injuries under multiple, alternate theories of recovery at trial "without relegating the damages to a particular theory of liability" and the "jury [may] allocate[] the total amount of damages to the different theories" or, if a general verdict form does not allow for such allocation, then the Court may elect which theory to award the total damages found by the jury. *See Atlas Flooring, LLC v. Porcelanite S.A. DE C.V.*, 425 F. App'x 629, 633 (9th Cir. 2011) ("The Court finds that the jury did not award duplicate damages to Atlas. The nature of the jury's verdict does not suggest double recovery. The expert witness testified about lost profits without relegating the damages to a particular theory of liability. The jury allocated the total amount of damages to the different theories."); *Roul v. George*, No. 2:13-CV-01686-GMN, 2014 WL 1308607, at *4 (D. Nev. Mar. 10, 2014), *report and recommendation adopted*, No. 2:13-CV-01686-GMN, 2014 WL 1305044 (D. Nev. Mar. 28, 2014) ("To the extent that claims alternatively pled give rise to the same damages, plaintiffs may only make a single recovery, with the court having the

ultimate authority to elect between the alternative theories."); *see also Mockler v. Multnomah Cnty.*, 141 F.3d 1177 (9th Cir. 1998) (affirming award where jury "split th[e] total amount among the various causes of action as provided on the verdict form submitted by the court"); *Yslava v. Hughes Aircraft Co.*, No. CIV-91-525-TUC-ROS, 1998 WL 35298580, at *17 (D. Ariz. June 29, 1998) (noting that "'plaintiffs are entitled to present alternate theories of liability to the jury, so long as appropriate instructions are given to prevent double recovery for any element of damage'" and "that 'it is perfectly acceptable for a plaintiff to seek the same damages under different theories of recovery'" (quotations omitted). Accordingly, Rico fails to cite any caselaw remotely resembling the circumstances in this case, and instead attempts to rely on inapposite cases in which a party failed to timely disclose damages or failed to provide a method of calculation at all.[3] Judgment as a matter of law fails.

> **2.** **The Jury Is Entitled to Determine Whether Punitive Damages Are Appropriate**.

There is no basis for Defendant Rico to strip the jury of its role in determining punitive damages in this case, which appropriate to "punish and deter" Defendants' "culpable conduct and act as a means for the community to express outrage and distaste for such conduct." *Countrywide Homes Loans, Inc. v. Thitchener*, 192 P.3d 243, 252 (Nev. 2008). The "threshold determination" for the Court to make at this stage is whether Rico's "conduct is subject" to punitive damages is easily met in this case based on the "substantial evidence"—i.e., "evidence that a reasonable mind might accept as adequate to support a conclusion"—of Rico's oppressive, fraudulent, or malicious conduct.

---

[3] *See* ECF No. 380 at 14-1 (citing *Jackson v. United Artists Theatre Cir., Inc.*, 278 F.R.D. 586, 595 (D. Nev. 2011) ("Plaintiffs' computation of damages was provided long after it should have been disclosed . . . ."); *Allstate Ins. Co. v. Nassiri*, No. 2:08-CV-00369-JCM, 2011 WL 2977127, at *6 (D. Nev. July 21, 2011) ("Neither the Spreadsheet nor Allstate's Supplements to its Initial Disclosures, however, informed the Defendants that Mr. Patterson had used a mathematical formula to determine the alleged actual settlement value of most of the underlying claims. . . . Allstate did not disclose the actual method it used to calculate the alleged settlement value of the claims until May 11, 2011, more than 3 1/2 months after Mr. Patterson was formally disclosed as Allstate's damages witness . . . ."); *Silver State Broad., LLC v. Beasley FM Acquisition*, No. 211CV01789APGCWH, 2016 WL 320110, at *3 (D. Nev. Jan. 25, 2016), *aff'd sub nom. Silver State Broad., LLC v. Bergner*, 705 F. App'x 640 (9th Cir. 2017) ("Here, the plaintiffs have not complied with Rule 26(a)(1)(A)(iii). ***They have never disclosed a computation of damages,*** even after these motions were filed, despite supplementing their Rule 26.1 disclosures eleven times. . . . Further, a list of lump sums does not satisfy the plaintiffs' Rule 26 obligation of providing a computation of damages.")).

*Bongiovi v. Sullivan*, 138 P.3d 433, 581-82 (2006). Because that threshold is clearly met here, "the decision to award punitive damages rests entirely within the jury's discretion." *Countrywide*, 192 P.3d at 253.

On this record, Defendant Rico's conclusory remark that "[t]he evidence in this case shows Plaintiffs simply cannot meet their burden" as to punitive damages is divorced from reality and the material facts. ECF No. 380 at 21. The (undisputed) record evidence showing Rico's egregious misconduct of soliciting and accepting bribes from Maza to send fraudulent emails from his Wells Fargo email account to Plaintiffs to "buy Maza time"—i.e., to prolong Maza's multi-million-dollar fraud scheme—squarely falls within Nevada's definition of "oppression, fraud or malice, express or implied" to warrant a jury's consideration of punitive damages. Nev. Rev. Stat. § 42.001; 42.005(1). While Defendant Rico prefers to ignore all of the damning evidence and testimony that is adverse to his position, in fact he engaged in a disturbing pattern of "fraud" "oppression" and "malice" that would support an award of punitive damages.[4]

Among other things, Rico satisfied these standards by following Maza's orders to make fraudulent misrepresentations regarding wires and holds in fake Wells Fargo emails he sent directly to Plaintiff Jasso—and to others knowing that they would be forwarded to Plaintiffs—in order to deprive Plaintiffs of their rights in their investments and to cause them damages by prolonging Maza's scheme by at least six months. Nev. Rev. Stat. § 42.001(2). In addition, Rico solicited and accepted bribes in his capacity as a bank employee in exchange for his substantial assistance in Maza's fraud, which was intended to injure Plaintiffs or was despicable conduct Rico engaged in "with a conscious disregard of the rights . . . of others" and actual "knowledge of the probable harmful consequences of a wrongful act and a willful and deliberate failure to act to avoid those consequences." Nev. Rev.

---

[4] In the context of punitive damages, the Nevada Statutes define "fraud" as "an intentional misrepresentation, deception *or* concealment of a material fact known to the person with the intent to deprive another person of his or her rights or property *or* to otherwise injure another person." Nev. Rev. Stat. § 42.001(2) (emphasis added). "Oppression" is defined as "despicable conduct that subjects a person to cruel and unjust hardship with conscious disregard of the rights of the person." Nev. Rev. Stat. § 42.001(4). And "malice, express or implied," is defined as "conduct which is intended to injure a person *or* despicable conduct which is engaged in with a conscious disregard of the rights or safety of others." Nev. Rev. Stat. § 42.001(3) (emphasis added).

Stat. § 42.001(1), (3); SOF at ¶¶ 7-46. This reprehensible conduct warrants an award of punitive damages, "for the sake of example and by way of punishing" a bank employee engaged in intentional misconduct that is harmful to bank customers. Nev. Rev. Stat. § 42.005; *see Roul*, 2014 WL 1308607, at *1 ("[T]he nature of [the defendant's] conduct demonstrates that [defendant] requires deterrence" and that "[a] strong punitive damage award against [defendant] would support that deterrence interest" where the defendant "made multiple false representations in order to encourage Plaintiff to make a number of purported 'investments' with [defendant]").

At minimum, a reasonable jury could "logically conclude[ ] that" Rico "consciously disregarded the [Plaintiffs'] rights" warranting an award of punitive damages in light of the "evidence [showing] multiple ignored warning signs suggesting that [Rico] knew of" Maza's fraudulent scheme, "as well as evidence indicating that [Rico] continued to" assist Maza carry out his scheme "despite knowing of the probable harmful consequences of doing so." *Countrywide*, 124 Nev. at 743–45 ("Given this knowledge of the probable harm that would result from" Defendant's misconduct, "the jury reasonably could have inferred that [its] casual attempts" to avoid the foreseeable harm "indicated a willful and deliberate failure on its part to avoid that harm," and thus "the jury could have logically concluded that Countrywide consciously disregarded the [Plaintiffs'] rights."). Defendant Rico is a sophisticated banker who held a Series 7 FINRA license and thus unquestionably foresaw the damaging consequences of misbehavior to conceal Maza's fraud from his investors, permitting a jury to "make a finding of whether such [punitive] damages will be assessed" and the "amount of such damages to be assessed" under Nevada law. Nev. Rev. Stat. § 42.005; *see Pasina for Estate of Taputu v. California Casualty*, 2:08-cv-01199-RCF-RJJ, 2009 WL 10693520, at *7 (D. Nev. Dec. 15, 2009) (Jones, J.) (denying defendant insurer's motion for summary judgment on punitive damages stemming from insurance bad faith claim because substantial evidence showed insurer's "conscious disregard" based on defendant's failure to timely accept Plaintiff's settlement offer and its examination of the tortfeasor without his attorney present in order to seek a declaratory judgment that he was not covered under the policy).

## IV.   CONCLUSION

For the foregoing reasons and based on the material facts in dispute, Plaintiffs respectfully request that the Court deny Defendant Rico's dispositive motion in full and allow their case against Rico to proceed to trial by jury.

Dated this 24th day of January, 2024.

SGRO & ROGER

/s/ Colleen Savage

ANTHONY P. SGRO
COLLEEN N. SAVAGE
**SGRO & ROGER**
2901 El Camino Ave., Suite 204
Las Vegas, Nevada 89102

AND

COURTNEY CAPRIO (*Admitted Pro Hac Vice*)
Florida Bar No. 933961
**KELLY UUSTAL, PLC**
500 N. Federal Highway, Suite 200
Fort Lauderdale, Florida 33301
Telephone: 954-522-6601
cac@kulaw.com

JEFFREY W. GUTCHESS (*Admitted Pro Hac Vice*)
COURTNEY CAPRIO *(Admitted Pro Hac Vice)*
JOANNA NIWOROWSKI (*Admitted Pro Hac Vice*)
AMANDA SUAREZ (*Admitted Pro Hac Vice*)
**AXS LAW GROUP, PLLC**
2121 NW 2nd Avenue, Suite 201
Miami, Florida 33127

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that I am an employee of Sgro & Roger and that on the 24th day of January, 2024, service of the foregoing PLAINTIFFS' RESPONSE TO DEFENDANT JOSE RICO'S MOTION FOR SUMMARY JUDGMENT AND STATEMENT OF UNDISPUTED MATERIAL FACTS was made by mandatory electronic service through the United States District Court's electronic filing system and/or by depositing a true and correct copy in the U.S. Mail, first class postage prepaid, and addressed to the following at their last known address:

JEFFREY WILLIS
RICHARD S. GORDON
ERICA J. STUTMAN
GREGORY J. MARSHALL
JACOB C. JONES
**SNELL & WILMER**
3883 Howard Hughes Pkwy., Ste. 1100
Las Vegas, NV 89169

Email: JWillis@swlaw.com
RGordon@swlaw.com
EStutman@swlaw.com
GMarshall@swlaw.com
JCJones@swlaw.com

*Attorneys for Defendant*
WELLS FARGO BANK, N.A.

JEFFREY WILLIS
ERICA J. STUTMAN
HAYLEY J. CUMMINGS
**SNELL & WILMER**
3883 Howard Hughes Pkwy., Ste. 1100
Las Vegas, NV 89169

Email: JWillis@swlaw.com
EStutman@swlaw.com
HCummings@swlaw.com

*Attorneys for Defendant*
KATHERINE DARRALL

MARK J. CONNOT
COLLEEN E. MCCARTY
**FOX ROTHSCHILD, LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, NV 89135

Email: MConnot@foxrothschild.com
CMccarty@foxrothschild.com

*Attorneys for Defendant*
JOSE RICO

 _/s/ Alexis Williams_
Employee of Sgro & Roger